Mark L. HELPIN

v.

**TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, Marjorie Jeffcoat, Thomas Freitag and Lawrence M. Levin, Appeal of Trustees of the University of Pennsylvania.**

Superior Court of Pennsylvania.

Argued Jan. 6, 2009.

Filed April 1, 2009.

Michael L. Banks, Philadelphia, for Trustee of University of Pennsylvania.

Patricia V. Pierce, Philadelphia, for Helpin.

BEFORE: BENDER, PANELLA and KELLY, JJ.

OPINION BY BENDER, J.

¶ 1 The Trustees of the University of Pennsylvania, Marjorie Jeffcoat, in her Individual and Official Capacities, Thomas Freitag, in his Official and Personal Capacities, and Lawrence M. Levin, in his Official and Personal Capacities (collectively "Penn"), appeal the judgment entered in favor of Mark L. Helpin (Dr. Helpin) on his claims of breach of contract and constructive discharge after removal from his position as director of the pediatric dental clinic operated by the University at the Children's Hospital of Philadelphia (CHOP). Dr. Helpin cross-appeals, contending that the trial court erred in declining to award pre-judgment interest on the award in question, some $4,040,000. Following careful considerations of the parties' respective arguments, we find that neither demonstrated reversible error. Accordingly, we affirm the judgment of the trial court.

¶ 2 The trial court, the Honorable Marlene Lachman, provided the following factual and procedural history in her Opinion Pursuant to Pa.R.A.P.1925(a) dated June 30, 2008. We find the trial court's recitation consistent with the record and accordingly reproduce it here:

> This case revolves around the employment relationship between Plaintiff Dr. Mark L. Helpin and the University of Pennsylvania's School of Dental Medicine ("Dental School") operated by Defendants the Trustees of the University of Pennsylvania ("Penn"), Dr. Marjorie Jeffcoat, and Dr. Lawrence M. Levin.

Plaintiff claims that Penn constructively discharged him by reassigning him from the Dental School dental clinic at Children's Hospital of Philadelphia ("CHOP") to a different Penn dental clinic in Bryn Mawr.

Following a three-week trial between June 4 and June 22, 2007, the jury found in favor of the Plaintiff on Count Two of his Amended Complaint alleging breach of contract. In so doing the jury determined (1) that Penn breached its employment contract with Plaintiff by constructively discharging him without "just cause," and (2) that Penn breached the terms of a 1989 contract with Plaintiff whereby Plaintiff was to receive 50% of the net profits from the operation of Penn's dental clinic at CHOP. The jury awarded Plaintiff $4.04 million in damages.

Penn filed a post-trial motion seeking a judgment notwithstanding the verdict [JNOV] or a new trial. Plaintiff filed his own "Motion for Post–Trial Relief and to Award Interest." This Court denied all of the post-trial motions and entered judgment on the jury's verdict on December 10, 2007. Penn filed a timely notice of appeal and Plaintiff conditionally cross-appealed.

The focal point of this case is Plaintiff's Exhibit P–1, which will be referred to as "the offer letter." The offer letter is on the letterhead of the University of Pennsylvania School of Medicine and is dated September 1, 1989. In the letter[,] Raymond J. Fonseca, Dean of the University of Pennsylvania School of Dental Medicine, offered Plaintiff a faculty appointment as Assistant Professor of Pediatric Dentistry, Clinician Educator track and designation as Director of the Division of Pediatric Dentistry in the Departmental Dental Care Systems. Plaintiff was to be named chairman if the Dental School created a separate Department of Pediatric Dentistry. Plaintiff was expected to spend 80% of his time reestablishing Penn's relationship with [CHOP]. Plaintiff's start date was October 1, 1989[,] and his starting salary was $60,000. The letter stated in part:

> In the future, patient care activities at CHOP will offer you the opportunity for bonuses and salary increases, with 50% of CHOP Dental's net operations available to you for such increments. I envision that a large portion of your future salary will, in fact, be derived from the net operations and success you will have at CHOP. I assure you this financial and salary/bonus arrangement will continue even if you no longer serve as Director or Chairman.

Despite this letter, Penn actually gave Plaintiff only an appointment as a Lecturer of Pedodontics/Dental Care Systems in the Academic Support Staff for a period of three years. This appointment was in a September 25, 1989 letter. . . . On October 7, 1991, Plaintiff was reappointed to this position for a period of one year.

In September 1992[,] Plaintiff received an appointment as an Assistant Professor of Dental Care Systems and Pediatric Dentistry in the Standing Faculty–Clinical Educator-of the Dental School for a period of three years. This position continued to be "subject to the stipulations given in Guidelines for Appointment and Promotions, January 8, 1995, or as amended."

Effective July 1, 1996, Plaintiff was promoted to Associate Professor of Dental Care Systems and Pediatric Dentistry in the Standing Faculty—Clinician Educator—of the Dental School. Plaintiff testified that it was not until he attained this appointment that he had a continu-

ing appointment. He was therefore covered under the University policy that he would have a job for life unless Penn had just cause for termination pursuant to the University Handbook or he was not able to generate enough income to offset his salary or expenses.

On July 1, 2003, Defendant Dr. Marjorie Jeffcoat replaced Dr. Fonseca as Dean of the School of Dental Medicine. In November 2003[,] she removed Plaintiff as Chair of the Department of Pediatric Dentistry, combined that Department with the Department of Restorative Dentistry and appointed Peter Berthold as Chair. In December 2003, Dean Jeffcoat and Dr. Berthold told Plaintiff he was being reassigned with the Dental School's Dental Network away from CHOP and to the Penn dental clinic in Bryn Mawr, effective January 2004.

Effective July 2004, Plaintiff's new compensation letter reduced his compensation. Like all previous letters, it was based on the number and nature of billable procedures performed. Because Plaintiff was in the Bryn Mawr boondocks instead of at CHOP, his billable procedures diminished, resulting in a decrease in compensation.

In September 2004, Plaintiff gave notice of his intention to resign from the Penn faculty effective the end of 2004. He contended that his resignation was forced due to (1) the intolerable conditions surrounding his reassignment from the CHOP Dental Clinic to Bryn Mawr, and (2) the reduction of his overall compensation because the practice component of his salary was no longer linked to CHOP Dental Clinic net operations.

Plaintiff accepted new employment as of January 2005 with the Carolinas Medical Center. Plaintiff relocated to North Carolina. In June 2005, Plaintiff voluntarily left Carolinas for personal reasons.

Plaintiff then accepted a position at Temple University as Director of the Department of Pediatric Dentistry.

Trial Court Opinion, 6/3/0/08, at 1–4 (internal citations omitted).

¶ 3 On appeal, Penn challenges Judge Lachman's refusal to grant JNOV on the assertion that the evidence adduced was not legally sufficient to sustain the causes of action Dr. Helpin pled. Penn argues, in the alternative, that it is entitled to a new trial due, among other things, to two of the trial court's rulings on the evidence, the first admitting the damages testimony of Dr. Helpin's expert witness, Edwin Rosenthol, and the second refusing admission of a chart used by Penn's expert Brian Sullivan, to counter Rosenthol's testimony. Penn's brief states its questions as follows:

1. Did the trial court err in failing to enter judgment as a matter of law or in failing to order a new trial for Defendants on Plaintiff's claim that he was contractually entitled to receive a portion of the profits of the Dental Clinic at [CHOP], even after Plaintiff ceased working at the clinic and after he resigned from his employment at [Penn]?

2. Did the trial court err in failing to enter judgment as a matter of law or in failing to order a new trial on Plaintiff's claim that he was constructively discharged from his employment at [Penn]?

3. In the alternative, did the trial court err in failing to offer Plaintiff a remittitur of damages, in an amount equivalent to what he would have earned in lost profits for the time he was transferred from the [CHOP] Dental Clinic until his resignation from his employment at [Penn]?

4. Did the trial court err in permitting opinion testimony by Plaintiff's expert, Edwin Rosenthol, concerning Plaintiff's alleged lost profits, given that the only factual support for such opinions was Plaintiff's "dreams" or aspirations about what he hoped to achieve at the Dental Clinic at [CHOP] where he no longer worked?

5. Did the trial court err in striking certain exhibits and testimony from Defendants' damages expert, Brian Sullivan, thus depriving the jury of an opportunity to hear evidence about how Plaintiff's damages model was inflated, speculative and unrealistic?

Brief for Appellant Trustees of the University of Pennsylvania, at 4–5.

¶ 4 Dr. Helpin has provided a counter-statement of the questions as well as two questions in support of his cross-appeal:

A. Whether the trial court properly denied Penn's motion for [JNOV] where the jury's verdict was supported by competent evidence?

B. Whether the trial court properly denied Penn's motion for a new trial where the record contained ample evidence to support the jury's verdict, and her evidentiary rulings were legally correct and resulted in no harm to Penn?

C. Whether the trial court properly denied Penn's request for a remittitur of damages where the jury's verdict was not so grossly excessive as to shock our sense of justice?

D. Whether the trial court erred as a matter of law and abused its discretion in denying Dr. Helpin's request for prejudgment interest?

E. In the event that Penn is successful in obtaining any appellate relief from the verdict or judgment in this action, whether the trial court erred as a matter of law in granting a nonsuit on Count IV of Dr. Helpin's Amended Complaint?

Brief for Appellee/Cross–Appellant Mark L. Helpin, at 5.[1]

¶ 5 Before proceeding to the merits of the parties' claims, we pause to note the pervasive violation of the Rules of Appellate Procedure apparent in Penn's recitation of the factual and procedural history of this case. Whereas Appellate Rule 2117(b) prohibits inclusion of argument in a party's statement of the case, Penn's statement, which spans the first 22 pages of its submission, is rife with contention, its characterizations of the record sharply skewed. Such tendentious statements are wholly inappropriate and do not advance a party's case, as they offer this Court no real guidance in considering the issues. Moreover, they violate the plain language of Rule 2117(b), which expressly directs that "[t]he statement of the case shall not contain any argument."[2] Although we proceed to the merits of the parties' claims in the interest of achieving substantial justice, Penn's counsel is admonished that the manner of preparation apparent in this portion of its brief is not to be repeated. We now proceed with our substantive review.

---

1. Because Dr. Helpin's question "E" is contingent upon award of the relief Penn requests, we shall not consider it further. As discussed, *supra*, we find Penn's claims without merit.

2. Rule 2117(b) reads in its entirety as follows:

**(b) All argument to be excluded.** The statement of the case shall not contain any argument. It is the responsibility of appellant to present in the statement of the case a balanced presentation of the history of the proceedings and the respective contentions of the parties.

¶ 6 Considering first the lead appeal filed by the University of Pennsylvania, we interpret Penn's first question as a challenge to the jury's determination that Penn breached its contract with Dr. Helpin. In support of its challenge, Penn enunciates multiple arguments, which its Statement of the Question Involved suggests might support either JNOV or the award of a new trial. In its argument, however, it limits its analysis to whether the evidence was legally sufficient to support the elements of Dr. Helpin's claim for breach of contract. Because claims of evidentiary insufficiency do not provide grounds for award of a new trial, we restrict our analysis to whether the trial court erred in not granting JNOV in response to Penn's arguments.

> [T]he proper standard of review for an appellate court when examining the lower court's refusal to grant a judgment n.o.v. is whether, when reading the record in the light most favorable to the verdict winner and granting that party every favorable inference therefrom, there was sufficient competent evidence to sustain the verdict. *Wenrick v. Schloemann–Siemag Aktiengesellschaft*, 523 Pa. 1, 4, 564 A.2d 1244, 1246 (1989). Questions of credibility and conflicts in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence. *Commonwealth, Dep't of Transp., Bureau of Traffic Safety v. Korchak*, 506 Pa. 52, 57, 483 A.2d 1360, 1362 (1984).

*Ferrer v. Trustees of University of Pennsylvania*, 573 Pa. 310, 825 A.2d 591, 595 (2002). Accordingly, to justify entry of a JNOV, the movant must establish either that he is entitled to judgment as a matter of law, and/or the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in the movant's favor. *See Schindler v. Sofamor, Inc.*, 774 A.2d 765, 771 (Pa.Super.2001). This Court will reverse the resulting decision only upon a showing that the trial court abused its discretion in denying the requested JNOV. *See Ferrer*, 825 A.2d at 595.

¶ 7 In support of its first question, Penn contends that the evidence fails to sustain Dr. Helpin's claim that his contract with the School of Dental Medicine entitled him to 50% of the net operations of the CHOP Dental Clinic. Brief for Appellant at 26. Penn's argument proceeds from the premise that neither the 1989 offer letter ("1989 Offer Letter") on which Dr. Helpin relies nor the parties' subsequent course of dealing demonstrated the parties' agreement in sufficiently definite terms to bind Penn to the 50% awarded by the jury. *Id.* at 27, 30. Rather, Penn argues, the 1989 Offer Letter was merely an "aspirational" document that was not honored or implemented by the parties following Dr. Helpin's appointment as a member of the Standing Faculty, and that the Letter was in fact superseded by the terms of subsequent appointment letters issued in 1992, 1993, 1995, and 1996. *Id.* at 25, 26. We find Penn's assertions unsubstantiated by the record.

¶ 8 The 1989 Offer Letter, to which Penn now takes exception, appears on University of Pennsylvania letterhead signed by the Dean of the School of Dental Medicine. Following the salutation, the letter continues as reproduced below, setting out both performance expectations and a compensation interest that would increase with the expected success of Dr. Helpin's efforts at the CHOP Dental Clinic:

> It gives me great pleasure to offer you a full-time faculty appointment as Assistant Professor of Pediatric Dentistry, Clinician–Educator track and designation as Director of the Division of Pediatric Dentistry in the Departmental

Dental Care Systems. If the School of Dental Medicine creates a separate Department of Pediatric Dentistry, then you will be named its Chairman.

As we discussed at length, the major challenges I present to you are to a lead a revival of the educational and clinical programs in Pediatric Dentistry at Penn and most especially to reestablish our relationship with The Children's Hospital of Philadelphia (CHOP) and to resurrect our patient care and educational programs there. I know very well that initial and future commitments to CHOP may require you to spend 80% of your time performing patient care and administrative duties there.

Your start date will be October 1, 1989. Your base salary for this academic year, 1989–1990, will be $60,000. In the future, patient care activities at CHOP will offer you the opportunity for bonuses and salary increments, with 50% of CHOP Dental's net operations available to you for such increases. I envision that a large portion of your future salary will, in fact, be derived from the net operations and success you will have at CHOP. I assure you this financial and salary/bonus arrangement will continue even if you no longer serve as Director or Chairman.

(Letter from Raymond J. Fonseca, DMD, to Dr. Mark Helpin, 9/1/89, at 1; Reproduced Record (R.R.) at A–1730).

¶ 9 Penn contends that the 1989 Offer Letter is "far too ambiguous and imprecise to support a contract" as the Letter fails to set forth the duration of the parties' commitment, Brief for Appellant at 26, and does not define how Dr. Helpin's compensation would be calculated, see id. at 29 ("This language vaguely referred to future 'opportunities' for bonuses and salary, but did not lay out any schedule for such anticipated salary or bonuses. Likewise, the

language stated that 'net operations' would be 'available,' but left ambiguous how 'net operations' would be defined and how the 'availability' of such funds would translate into actual payments to Dr. Helpin."). Penn concludes accordingly that the 1989 Offer Letter cannot constitute a binding contract as "there is no basis for determining whether the agreement has been kept or broken[.]" See id. (quoting Linnet v. Hitchcock, 324 Pa.Super. 209, 471 A.2d 537, 540 (1984)). Dr. Helpin rejoins that evidence of the parties' agreement was not limited to the 1989 Offer Letter but also consisted of testimony and documentary evidence substantiating a course of conduct that lasted for thirteen years, during which the parties acted in accordance with the Letter. Brief for Appellee at 26 (quoting Greene v. Oliver Realty, Inc., 363 Pa.Super. 534, 526 A.2d 1192, 1201 (1987)) ("[E]ven '[v]ague and indefinite agreements are routinely enforced as long as courts are able to supply reasonable terms. Courts are more willing to supply such terms if the parties have already partially performed their obligations'".). Upon consideration of the record, we find the evidence sufficient to supply such terms as may not be apparent on the face of the 1989 Offer Letter and ample to sustain the trial court's order denying JNOV.

¶ 10 The goal of contractual interpretation is to ascertain the intent of parties at the time they entered the disputed agreement and to give effect to the agreement's terms. Greene v. Oliver Realty, Inc., 363 Pa.Super. 534, 526 A.2d 1192, 1194 (1987). We will find the parties' agreement enforceable as a contract "when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity." Weavertown Transport Leasing, Inc. v. Moran, 834 A.2d 1169, 1172 (Pa.Super.2003). An

agreement is expressed with sufficient clarity "if the parties intended to make a contract and there is a reasonably certain basis upon which a court can provide an appropriate remedy." *See Greene,* 526 A.2d at 1194. Accordingly, "not every term of a contract must always be stated in complete detail[.]" *Snaith v. Snaith,* 282 Pa.Super. 450, 422 A.2d 1379, 1382 (1980). If the parties have agreed on the essential terms, the contract is enforcible even though recorded only in an informal memorandum that requires future approval or negotiation of incidental terms. *See Yellow Run Coal Co. v. Alma–Elly–Yv Mines, Ltd.,* 285 Pa.Super. 84, 426 A.2d 1152, 1155 (1981). In the event that an essential term is not clearly expressed in their writing but the parties' intent concerning that term is otherwise apparent, the court may infer the parties' intent from other evidence and impose a term consistent with it. *See Greene,* 526 A.2d at 1194. Indeed, terms of an agreement that appear otherwise vague may be rendered definite by subsequent performance: "One or both parties may perform in such a way as to make definite that which was previously unclear." *Greene,* 526 A.2d at 1194.

¶ 11 In view of the foregoing standards, we find no merit in Penn's assertion that the evidence is legally insufficient to support contract formation. In point of fact, multiple witnesses, all former Penn employees responsible for administering Dr. Helpin's compensation arrangements, testified concerning the parties' specific understanding of the terms of the 1989 Offer Letter. Their testimony provided more than ample detail from which the court could fashion a remedy for non-performance, and could, consequently, recognize the formation of an enforceable contract. *See Linnet v. Hitchcock,* 324 Pa.Super. 209, 471 A.2d 537, 540 (1984).

¶ 12 Although, as Penn argues, the 1989 Offer Letter delineates no formula by which "50% of net operations" would be calculated, that deficiency, and the others to which Penn points ("In the future, patient care activities at CHOP will offer you the opportunity for bonuses and salary increments ..."), were cured through the parties' course of conduct. Dean Raymond Fonseca, who hired Helpin and remained as Dean of Penn's Dental School until 2003, testified that he hired Dr. Helpin to help revive the school's flagging clinical programs, repair a fractured relationship with CHOP, and to re-open the CHOP Dental Clinic, which Penn had formerly operated. N.T., 6/5/07, at 53–56, 65, 66 (R.R. at A422–A434, 435, 436). Dean Fonseca testified that Dr. Helpin's base salary, at $60,000 annually, was well below market rate and failed to provide compensation commensurate with the challenges he was asked to undertake. *Id.* at 68 (R.R. at A437). Thus, as an incentive to accept the position, the 1989 Offer Letter created a correlation between the financial performance of the clinic, Helpin's standing as a member of the faculty at Penn, and the total compensation he would receive. *Id.* at 68–69 (R.R. at A437–438). Dean Fonseca testified further that the Dr. Helpin was to be paid "50 percent of the net operations revenue" collected by the CHOP clinic for inpatient, outpatient and hospital services. *Id.* at 70, 76 (R.R. at A439, A445) ("[The agreement] was that he had a base salary and on top of that base he would supplement that income by 50 percent of the net operations revenue that he generated at CHOP dental clinic and the CHOP hospital, inpatient and outpatient."). Fonseca testified, in addition, that "net operations revenue" was determined by deducting the clinic's operating expenses, including the salaries of the dentists and support staff employed there, from the clinic's to-

tal revenue.[3] *Id.* at 70, 72–73 (R.R. at A439, A441–442). Because expenses, including salaries, changed from year to year, net operations revenue changed as well, requiring that Dr. Helpin and Dean Fonseca confer annually to agree on deductible operating expenses and, ultimately, the amount of money remaining from which the practice component of Helpin's compensation would be paid. *Id.* at 79 (R.R. at A448); N.T., 6/7/07, at 92–93, 98 (R.R. at A–837, A838, A843). After the parties reached an agreement, Dean Fonseca would send Dr. Helpin an annual compensation letter and approve payment in accordance with its terms as an administrative formality[4]. N.T., 6/5/07, at 75 (R.R. at A444); N.T., 6/11/07, at 67 (R.R. at A980). Both Dean Fonseca and former Director of Fiscal Operations Barry Dahlen testified that the parties followed the compensation arrangement stated in the 1989 Offer Letter for thirteen years until Fonseca completed his tenure as dean and defendant Marjorie Jeffcoat assumed office. N.T., 6/5/07, Volume II, at 97 (R.R. at A842, A843). Thus, while Helpin's calculated salary was subject to change on an annual basis, he remained entitled to "50 percent of net operations" as explained in the 1989 Offer Letter and was free either to accept the money as additional salary or to allocate portions of it for uses at the CHOP clinic, which he sometimes did.[5] N.T., 6/11/07, at 31, 32, 34 (R.R. at A944, A945, A947). By the same token, had the CHOP clinic record-

ed a loss, Dr. Helpin would have received nothing and would have had to return any money previously advanced for the period when the loss occurred. *Id.* at 99 (R.R. at A844). According to Dean Fonseca, the parties also understood that Dr. Helpin would remain subject to that arrangement as long as he continued his employment at Penn. N.T., 6/5/07, at 50–51 (R.R. at A542–A543).

¶ 13 In view of the foregoing testimony, we find the evidence more than sufficient to delineate the terms of the parties' bargain as a legally binding contract. Whereas the 1989 Offer Letter might appear as "an informal memorandum [requiring] future approval or negotiation of incidental terms," *Yellow Run Coal Co.*, 426 A.2d at 1155, Dean Fonseca's testimony and that of Fiscal Director Dahlen demonstrate that the parties reduced their agreement to a course of conduct based on a comprehensive understanding of the 1989 Offer Letter. For thirteen years, the parties performed according to the terms of that Letter, augmenting them in practice where necessary and documenting their performance through copious business records. Both parties understood their agreement to be binding, recognizing that while the numbers that "50% of net operations" generated would likely change from year to year, the legal mandate from which the formula arose did not. Consequently, despite Penn's current protestations, we fail to discern how the same formula by which

---

3. Dean Fonseca also testified that Helpin's compensation arrangement was identical to one Penn had previously accepted for the director of the Dental School's Microbiologic Testing Laboratory. N.T., 6/5/07, at 70.

4. Penn's repeated suggestion that the existence of a contract is undermined by the need for administrative oversight of the process of paying Dr. Helpin is not supported by any citation to authority and, as a matter of law, is plainly untenable. Even the most specifi-

cally delineated of contracts must be executed by human agency. Thus, the dispositive question is not whether administrative oversight was required, but whether the parties' agreement provided sufficient detail to enable such oversight.

5. The record also intimates that Dr. Helpin sometimes did not draw down all amounts due in a given year due to tax considerations.

Penn compensated a once-valued employee for over thirteen years "does not offer a reasonably certain basis upon which a court can provide an appropriate remedy," *see Greene*, 526 A.2d at 1194, in the event of a subsequent breach. We conclude accordingly that the evidence was more than ample to establish the formation of a contract arising out of Penn's 1989 Offer Letter.

¶ 14 Notwithstanding the formation of a contract, Penn argues also that the 1989 Offer Letter did not vest Dr. Helpin with a right to permanent employment at Penn and that, consequently, after he resigned in 2004, he was no longer entitled to any compensation. Brief for Appellant at 32, 38. We find Penn's further argument on this point less than coherent as it asserts first that Dr. Helpin was an at-will employee, *id.* at 32–33, but then acknowledges that his 1996 promotion to associate professor constituted a guarantee of continued employment from which he could be discharged only for just cause.[6] *Id.* at 34. Consequently, the significance Penn asserts in the failure of the 1989 Offer Letter to specify a definite duration eludes us. Given Dr. Helpin's status as a tenured professor at the time of Penn's asserted breach, subject to termination only for just cause, the failure of the Letter to define a term of duration is irrelevant and does not render Dr. Helpin an "at will" employee. *See Rapagnani*, 736 A.2d at 669.

¶ 15 In point of fact, the aspect of the Letter that Penn now disputes is not truly the term of Dr. Helpin's employment, but the duration of his compensation arrangement as related to the CHOP clinic. The 1989 Offer Letter makes that arrangement open-ended, providing an income guarantee which, by its own terms, might be invoked only *after Helpin's completion of his term as chair of his department*, an event that did not occur until 2003. N.T., 6/5/07, at 69 (R.R. at A438). Helpin's faculty appointments in the interim, each for a term of years at a stated salary, were not, as Penn argues, Brief for Appellant at 35 (quoting *Muchow v. Schaffner*, 180 Pa.Super. 413, 119 A.2d 568, 570 (1956)), inconsistent with that income guarantee. In point of fact, they bore no relation to it except to the extent that Helpin had to be employed at Penn to collect a salary drawn from the income of the CHOP clinic. Penn's arguments to the contrary, that Helpin's intervening faculty appointments superseded the Offer Letter's income guarantee, misperceive the purpose of those appointment letters as well as the nature of the parties' agreement. Although the subsequent appointment letters individually extended Helpin's academic appointment during a period when it remained at-will, none of them altered his income arrangement from the CHOP clinic. Moreover, they made no mention of his status once he was no longer a department chair. Consequently, their terms are immaterial to the dispute now before us.

¶ 16 The evidence establishes, without contradiction, that Helpin remained as chair for seven years after his employment guarantee had vested. Penn does not dispute the terms of that guarantee, nor does it assert that the Dental School ever invoked the "just cause" provisions of that arrangement to terminate Dr. Helpin. Rather, Penn argues, Dr. Helpin left of his

---

6. The presumption of Pennsylvania law that employment is "at will" is rebutted upon a showing of: "(1) an agreement for a definite duration; (2) *an agreement specifying that the employee will be discharged for just cause only;* (3) sufficient additional consideration; or (4) an applicable recognized public policy exception." *Rapagnani v. Judas Co.* 736 A.2d 666, 669 (Pa.Super.1999) (emphasis added).

own accord and thereby relinquished any right he had to collect further salary from the CHOP clinic. However, Penn's position finds no support in the evidentiary record; indeed, Helpin's own testimony suggests that, but for the events that generated this litigation, he would have remained at Penn until retirement, pursuant to his employment guarantee.[7] N.T., 6/11/09, at 90–91 (R.R. at A1003–04). Moreover, Dean Fonseca's testimony made clear that he, as the responsible University of Pennsylvania officer, gave Dr. Helpin every assurance that his income guarantee was inviolable and would remain in place as long as Dr. Helpin chose to remain at the Dental School. N.T., 6/5/07 (Volume I), at 69–70 (R.R. at A438–A439); (Volume II), at 48–49, 50–52 (R.R. at A540–A541, A542–A544). Although that evidence does not support Penn's theory of the case, it is legally sufficient nonetheless to establish Dr. Helpin's income guarantee as a legally enforceable provision of the parties' agreement. The jury found that evidence credible as it was privileged to do in its role as finder of fact. Penn's assertion to the contrary is without merit.

■■■ ¶ 17 In support of its second question, Penn asserts that the trial court erred in refusing to enter JNOV in its favor on the issue of whether the circumstances to which Dr. Helpin was subject at Penn imposed a constructive discharge. Brief for Appellant at 39. This Court has held that "[c]onstructive discharge of an at-will employee may serve as a basis for tort recovery if the employer has made working conditions so intolerable that an employee has been forced to resign." *Highhouse v. Avery Transp.*, 443 Pa.Super. 120, 660 A.2d 1374, 1376 (1995) (citing *Kroen v. Bedway Sec. Agency, Inc.*, 430 Pa.Super. 83, 633 A.2d 628, 633–634 (1993)).[8] In this context, "[i]ntolerability ... is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt *compelled* to resign, that is, whether he would have had no choice but to resign." *Connors v. Chrysler Financial Corp.*, 160 F.3d 971, 976 (3d Cir.1998). It may not be premised upon the conclusion that resignation was the wisest or best decision under the circumstances, nor is it established based on an employee's subjective judgment. *See id.*

■■■ ¶ 18 Penn acknowledges, albeit reluctantly, that sharp cuts in an employee's compensation may constitute grounds for a finding of "intolerability" such as to sustain a claim of constructive discharge. Brief for Appellant at 43 (citing *Kroen*, 633 A.2d at 628). Penn suggests, however, that such a finding is precluded here as Dr. Helpin, although denied his contracted compensation from operation of the CHOP clinic, was still collecting a six-figure salary from his academic appointment as associate professor. *Id.* This argument is flatly disingenuous. Although the evidence did show that Dr. Helpin continued to collect a substantial academic salary, it also showed that, after his removal from the CHOP clinic, his compensation was cut

---

7. Dr. Helpin testified specifically that he declined to pursue a comparable position at Boston Children's Hospital in reliance upon the continued enforceability of his contracted compensation arrangement at Penn. He discussed it specifically in view of the end of Dean Fonseca's tenure as dean and Fonseca assured him that the arrangement would continue.

8. Our cases have also acknowledged the possibility that facts sufficient to establish constructive discharge in an at-will employment scenario may show breach of contract vis-à-vis employees who, like Dr. Helpin, enjoy an employment guarantee. *See Grose v. Procter & Gamble Paper Products*, 866 A.2d 437, 441 (Pa.Super.2005)

by two thirds. In the preceding year, Dr. Helpin had earned approximately $350,000, due substantially to his income from the CHOP clinic. N.T., 6/11/07, at 44–45, 52; Plaintiff's Exhibit # 2 (R.R. at A1077–A1078, A1085, A1731). Moreover, further testimony established that after Dr. Helpin was removed from the position of department chair, he was prohibited from seeing patients at the CHOP clinic whom he previously had treated, and was not supplied with an office, clerical staff or computer at the location to which he was transferred. Further evidence showed that he was denied reimbursement for routine expenses, accused of budgetary improprieties, and issued a disciplinary letter by the new dean. These circumstances cause us no hesitation in finding the evidence legally sufficient to sustain the constructive discharge claim. *Cf. Kroen,* 633 A.2d at 634 (finding evidence legally sufficient to establish *prima facie* case for constructive discharge where employee .was demoted and his compensation cut by 71%). The substantial nature of Dr. Helpin's continued compensation is not a basis upon which Penn can circumvent the objective standard by which a claim of constructive discharge is judged; nothing in our law or in any authority Penn cites mandates that a plaintiff prove penury as a result of the defendant's actions to prove that he was forced to resign. So long as a reasonable person under the circumstances would feel "compelled" to resign, those circumstances are ample to sustain the claim as a matter of law. *See Highhouse,* 660 A.2d at 1376. No blanket prescription or formula of diminished compensation will suffice to determine what must be circumstantially measured; the personal needs that might compel the employee's decision will, of necessity, be different in every case and must be measured individually on the relative merit of the evidence adduced. Although the jury, as factfinder, might exercise its prerogative to find that those circumstances would not have compelled the reasonable person to tender a forced resignation, it is not a proper subject for JNOV so long as the evidence allows reasonable minds to differ on the outcome. *See Schindler,* 774 A.2d at 771. The trial court did not err in so finding.

¶ 19 Concerning both its first and second questions, Penn posits the additional argument that the trial court erred in not granting a new trial on the basis that the verdict was against the weight of the evidence. Brief for Appellant at 50. Where, as here, the appellant asserts the weight of the evidence as grounds for award of a new trial, our review is exceptionally limited.

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Widmer,* 560 Pa. 308, 744 A.2d 745, 751–52 (2000) (citations and footnote omitted). Significantly,

> [a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses

and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Id.* Upon review of the trial court's Opinion Pursuant to Pa.R.A.P.1925(a), we find the trial judge's exercise of discretion wholly consistent with the foregoing standard. Having heard the testimony and observed every witness, the court concluded that "[t]he jury's decision should stand because it is not unreasonable, arbitrary, or capricious." Trial Court Opinion, 6/30/08, at 2. As an appellate court, we are not invested with the ability to revisit that determination absent some extraordinary discrepancy of record. Here we find none.

▮▮▮▮ ¶ 20 In support of its third question, Penn posits an alternative argument that should this Court uphold the verdict as to breach of contract but reverse as to constructive discharge, we should grant *remittitur* of all damages awarded for the period after Dr. Helpin's September 2004 resignation. Brief for Appellant at 51–52. Of course, because we have found the evidence here legally sufficient to sustain Helpin's claim of constructive discharge, we have no occasion to grant *remittitur* for any period of time. Dr. Helpin's evidence in the form of expert testimony and supporting documentation demonstrated his losses for the life of his employment guarantee at Penn. Because Helpin was guaranteed continued employment absent just cause for termination his tenure defined the duration of his income guarantee from the CHOP clinic. Under such circumstances, where the evidence correlates to the damages award granted, we as an appellate court are not competent to reach a contrary determination.[9] Accordingly, we find Penn's third question without merit.

▮▮▮▮ ¶ 21 In support of its fourth question, Penn challenges the testimony of Dr. Helpin's expert, Edwin Rosenthol, contending that Rosenthal's opinion was not adequately supported by facts of record but was instead premised on Dr. Helpin's "dreams" for the CHOP clinic. Brief for Appellant at 54–55. Penn argues accordingly that Rosenthol's testimony was based merely upon speculation and conjecture and was therefore inadmissible. *Id.* The trial court found to the contrary that Rosenthol's opinion was grounded in a substantial amount of documentary evidence as well as the testimony of Dr. Helpin's witnesses, who testified extensively concerning the CHOP clinic's productivity under Dr. Helpin's administration. Trial Court Opinion, 6/30/08, at 14–15. We find no error in the trial court's determination.

---

9. Where an appellant's claim arises from a challenge to the jury's determination of damages, our review is highly circumspect:

> The duty of assessing damages is within the province of the jury and should not be interfered with by the court, unless it clearly appears that the amount awarded resulted from caprice, prejudice, partiality, corruption or some other improper influence. In reviewing the award of damages, the appellate courts should give deference to the decisions of the trier of fact who is usually in a superior position to appraise and weigh the evidence.
>
> *Ferrer v. Trustees of University of Pennsylvania*, 573 Pa. 310, 825 A.2d 591, 611 (2002) [internal citations omitted]. "If the verdict bears a reasonable resemblance to the damages proven, we will not upset it merely because we might have awarded different damages." *McManamon v. Washko*, 906 A.2d 1259, 1285 (Pa.Super.2006).

*Betz v. Erie Ins. Exchange*, 957 A.2d 1244, 1264 (Pa.Super.2008).

Initially, we note that "[t]he admission of expert testimony is a matter of discretion [for] the trial court and will not be remanded, overruled or disturbed unless there was a clear abuse of discretion." *Blicha v. Jacks*, 864 A.2d 1214, 1218 (Pa.Super.2004). Indeed, admission of the disputed testimony "must be shown to have been not only erroneous but also harmful.... Evidentiary rulings which did not affect the verdict will not provide a basis for disturbing the jury's judgment." *Detterline v. D'Ambrosio's Dodge, Inc.*, 763 A.2d 935, 940 (Pa.Super.2000) (quoting *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 707 (Pa.Super.2000)).

*Betz*, 957 A.2d at 1258.

■■■■ ¶ 22 We recognize, of course, that expert testimony is incompetent if it lacks an adequate basis in fact. *See Viener v. Jacobs*, 834 A.2d 546, 558 (Pa.Super.2003). "While an expert's opinion need not be based on absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise." *Id.* Rather, "[an expert's] assumptions must be based upon such facts as the jury would be warranted in finding from the evidence." *Id.* Accordingly, the Pennsylvania Rules of Evidence prescribe a threshold for admission of expert testimony dependant upon the extent to which the expert's opinion is based on facts and data:

**Rule 703. Bases of opinion testimony by experts**

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Pa.R.E. 703.

■■■ ¶ 23 Clearly, Rule 703 requires a greater foundation for the opinion and conclusions of an expert witness than a party's "dreams" or aspirations for the future profitability of a business or professional practice. Accordingly, were Penn's assertions concerning the basis of Mr. Rosenthol's opinion true, the opinion would not be admissible. Brief for Appellant at 56 ("Thus, Mr. Rosenthol admitted that his assumptions concerning future growth in the 'net operations' of the CHOP Dental Clinic from 2003–2013 were based only on Dr. Helpin's own wishes and speculation."). To Penn's discredit, however, its assertions are not true, finding support only in a truncated, self-serving interpretation of the record that emphasizes isolated words at the expense of any serious consideration of the sworn testimony or, for that matter, even the face of Mr. Rosenthol's report. Lost Compensation Report Prepared by Edwin Rosenthol, CPA/ABV, 1–2 (R.R. at A149–A150).

■■■ ¶ 24 In this regard, the Lost Compensation Report itself is illustrative, providing an extensive listing of the documentation the expert considered in reaching his opinion:

1. Offer of employment letter from Raymond J. Fonseca, D.M.D., Dean of the School of Dental Medicine, to Mark Helpin, D.M.D., dated September 1, 1989.

2. Salary letter from Raymond J. Fonseca, D.M.D. to Mark Helpin, D.M.D. for the academic year beginning July 1, 1996, dated June 19, 1996.

3. Salary letter from Raymond J. Fonseca, D.M.D. to Mark Helpin, D.M.D. for the academic year be-

ginning July 1, 1997, dated June 23, 1997.

4. Salary letter from Raymond J. Fonseca, D.M.D. to Mark Helpin, D.M.D. for the academic year beginning July 1, 1998, dated June 18, 1998.

5. Salary letter from Raymond J. Fonseca, D.M.D. to Mark Helpin, D.M.D. for the academic year beginning July 1, 1999, dated June 23, 1999.

6. Salary letter from Raymond J. Fonseca, D.M.D. to Mark Helpin, D.M.D. for the academic year beginning July 1, 2000, dated June 19, 2000.

7. Salary letter from Raymond J. Fonseca, D.M.D. to Mark Helpin, D.M.D. for the academic year beginning July 1, 2001, dated June 18, 2001.

8. Salary letter from Raymond J. Fonseca, D.M.D. to Mark Helpin, D.M.D. for the academic year beginning July 1, 2002, dated June 21, 2002.

9. Salary letter from Raymond J. Fonseca, D.M.D. to Mark Helpin, D.M.D. for the academic year beginning July 1, 2003, dated June 13, 2003.

10. Salary letter from Marjorie K. Jeffcoat, D.M.D., Dean of The School of Dental Medicine, to Mark Helpin, D.M.D. for the academic year beginning July 1, 2004, dated July 1, 2004.

11. CHOP Dental Clinic monthly statement of Revenue, Expenses and Net Operation for budget year 1999.

12. CHOP Dental Clinic monthly statement of Revenue, Expenses and Net Operation for budget year 2000.

13. CHOP Dental Clinic monthly statement of Revenue, Expenses and Net Operation for budget year 2001.

14. CHOP Dental Clinic monthly statement of Revenue, Expenses and Net Operation for budget year 2002.

15. CHOP Dental Clinic monthly statement of Revenue, Expenses and Net Operation for budget year 2003.

16. CHOP Dental Clinic monthly statement of Revenue, Expenses and Net Operation for budget year 2004.

17. Schedule entitled CHOP New Operations prepared by Mark Helpin D.M.D. dated 3/17/04.

18. Mark L. Helpin, D.M.D., Curriculum Vitae.

19. Letter from Raymond J. Fonseca, D.M.D., dated November 9, 2000, giving his approval for the creation of an account in which Dr. Helpin was allowed to deposit the "Department's unencumbered portion of CHOP income."

20. Document entitled "Factors that would impact CHOP Net Operations in future," prepared by Marl [sic] Helpin, D.M.D., dated 7/30/04.

21. Copy of Mark Helpin's final pay stub from the University of Pennsylvania.

22. Employment Agreement between Mark Helpin, D.M.D. and The Charlotte–Mecklenburg Hospital Authority d/b/a Carolinas Medical Center dated November 3, 2004 and effective January 1, 2005.

23. Benefits Enrollment Guide and Pension Plan summary plan de-

scription for Carolinas Healthcare System.

*Id.* Penn offers little explanation as to specifically how an opinion so extensively documented is rendered impermissibly speculative. Nor has it addressed the individual sources upon which Mr. Rosenthol relied except to denigrate Dr. Helpin's future impact statement (# 20 above), pejoratively characterizing it as "Dr. Helpin's 'dreams' document" and "Plaintiff's wish list." Brief for Appellant at 56. Fortunately for all parties, however, appellate review is not premised on strength of innuendo, but upon an aggrieved party's ability to demonstrate its entitlement to relief on the basis of controlling law as applied to the facts of record.

¶ 25 In this case, the facts of record demonstrated that the CHOP clinic prospered under Dr. Helpin's direction for 13 years and offered no indication that such prosperity would not have continued *had Dr. Helpin been allowed to continue in his former capacity as the clinic's director.* Penn's assertion to the contrary, based upon changes in clinic operations and decreased clinic revenues in the years after Helpin's departure, Brief for Appellant at 56–58, offers no basis for calculation of Dr. Helpin's damages as it shows no correlation with Dr. Helpin's performance. The question for expert opinion and consideration by the factfinder was not whether the CHOP clinic would perform according to Dr. Helpin's plans after his departure, but rather, what losses Helpin sustained upon being deprived of his right to continue. Mr. Rosenthol's report addressed the latter question on the basis of the extensive documentation outlined. We find no basis on which to deem it impermissibly speculative.

¶ 26 In support of its fifth question, Penn asserts that the trial court erred in precluding its admission into evidence of a damages chart prepared by its expert, Dr. Brian Sullivan. Penn contends that the chart, which calculated Dr. Helpin's damages by present value rather than the total offset method used by Mr. Rosenthol, showed Rosenthol's damages calculation to be grossly inflated.[10] Brief for Appellant at 18. In support of its argument, Penn cites our Supreme Court's decision in *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027, 1037 (1980). In that case, the Court applied the total offset method to calculate damages for future lost earnings in a plaintiff's wrongful death and survival action and abandoned the practice of discounting future earnings to present value. *See id.* In support of that holding, the Court explained it objectives as follows:

> Mindful of our goal that a damage award formula should strive to be efficient, predictable as well as accurate, in computing lost future earning capacity this Commonwealth adopts the *Feldman [v. Allegheny Airlines, Inc.,* 524 F.2d 384, 387 (2nd Cir.1974[1975])] court's approach to calculating lost productivity and the Alaska court's total offset approach to inflation and discounting to present value. We believe that this eclectic method best computes a damage award which will fairly compensate a victim to the full extent of his or her injuries and avoids unnecessary complexities likely to produce confusion although in reality contributing little to the degree of accuracy to be obtained. Although judges and juries are not fortune tellers equipped with crystal balls, the *Feldman* approach to determining

---

**10.** The total offset method of damages calculation "assumes that future increases in earnings due to inflation are offset by the interest rate so no reduction to present value is made." *Slaughter v. R.D. Werner Co.,* 25 Pa.D. & C.4th 518, 538–39 (Pa.Com.Pl.1995).

productivity as a factor in awarding future lost earning best approximates the soothsayers by presenting the triers of fact with all relevant evidence. After laying a proper foundation, expert and lay witnesses are called upon to testify as to the victim's past and future employment possibilities. The defense may cross-examine the plaintiff's witnesses and present evidence on their own behalf. Upon a thorough evaluation of all the evidence presented, the factfinder makes an informed estimation of the victim's lost earning capacity.

*Kaczkowski,* 421 A.2d at 1036 (citing *Feldman v. Allegheny Airlines, Inc.,* 524 F.2d 384, 387 (2nd Cir.1975); *State v. Guinn,* 555 P.2d 530 (Alaska 1976)).

¶ 27 Despite its approval of the total offset method, the Court declined to impose it in every case, choosing instead to determine the appropriate method of calculation on a more individualized basis:

This Commonwealth now requires that a damage award be discounted to its present value by using six percent simple interest figure. We do not wish to disturb this requirement in calculating future damages in other contexts. We refrain "from attempting to fashion broad general rules as a panacea. The obviously wiser course is to resolve disputes on a case-by-case basis until we develop, through experiences in (an) area, a sound basis for developing overall principles." *Pa. L. R. Bd. v. State College Area School District,* 461 Pa. 494, 500, 337 A.2d 262, 265 (1975).

*Kaczkowski,* 421 A.2d at 1037 n. 21.

¶ 28 In this case, the trial court applied the total offset calculation espoused in *Kaczkowski* on the basis that the losses sustained by Dr. Helpin are more akin to a loss of individual productivity than to the loss of profits in a business to which Penn analogized them at trial. Trial Court

Opinion, 6/30/08, at 18–19. We find no abuse of discretion in the trial court's determination. As the profits of the CHOP clinic paid to Dr. Helpin were substantially a function of his individual productivity and are limited to Helpin's working life, the factors considered by our Supreme Court in *Kaczkowski* to gauge individual productivity as a measure of damages appear equally applicable here. Penn offers no authority from any jurisdiction to suggest the contrary. Accordingly, we find no error in the court's application of the total offset method to damages in this case and its consequent refusal to admit the chart prepared by Dr. Sullivan using the present value method. Thus, we find no merit in Penn's fifth question.

■■■■■ ¶ 29 Finally, we consider the sole question awaiting resolution in Dr. Helpin's cross-appeal. Helpin contends that the trial court erred in refusing to grant prejudgment interest on the verdict the jury awarded. Brief for Appellee/Cross–Appellant at 51. Helpin acknowledges, however, that because the amount due was not "fixed" or readily ascertainable, he is not entitled to prejudgment interest as a matter of right. Brief for Appellee/Cross–Appellant at 52–53. Indeed, such interest is not the rule, but the exception and may be allowed only "as necessary to ensure that in the particular circumstances of the case, the plaintiff has been fully compensated." *Frank B. Bozzo, Inc. v. Electric Weld Div. of Fort Pitt Div. of Spang Indus., Inc.,* 345 Pa.Super. 423, 498 A.2d 895, 899 (1985).

Such damages are designated not "interest as such" but rather "compensation for delay" "in the nature of interest", and are measured by the legal rate of interest. The test for determining whether the plaintiff has been fully compensated has been variously stated, by the cases ("depends upon all the circum-

stances of the case"), the U.C.C. ("reasonable expense incident to the delay or other breach"), and the Restatements ("as justice requires").

*Id.* at 901.

¶ 30 Reflecting on the claim at issue here, the trial court explained its decision to deny pre-judgment interest on the basis that:

> The jury's award of $4.04 million more than adequately compensated the Plaintiff for the delay in receiving the funds. Furthermore, prejudgment interest would have been duplicative because the jury's damage award primarily consisted of damages for lost *future* earnings and not for lost *past* earnings. The Plaintiff had no right to prejudgment interest on the sum awarded for lost future earnings.

Trial Court Opinion, 6/30/08, at 20. Following extended review of the record, we find no basis on which to revisit the trial court's determination. As the trial court observes, the substantial majority of the damages assessed correspond to the period after judgment extending through what would have been Dr. Helpin's remaining work life at Penn. As discussed, *infra,* the damages were calculated by the total offset method and were not reduced to present value. Consequently, we see no basis for an award of any interest whatsoever. We conclude accordingly, that the trial court did not err in its disposition of this claim.

¶ 31 For the foregoing reasons, we find no merit in either appeal. Accordingly, we shall affirm the trial court's judgment as entered.

¶ 32 Judgment **AFFIRMED.**