J-A26012-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CHANEL GLOVER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NICOLE JUNIOR | : | No. 1369 EDA 2022 |

Appeal from the Order Entered May 4, 2022
In the Court of Common Pleas of Philadelphia County Domestic Relations
at No(s):  D22048480

BEFORE:   BOWES, J., KING, J., and PELLEGRINI, J.*

DISSENTING MEMORANDUM BY BOWES, J.:     **FILED FEBRUARY 24, 2023**

I believe that Ms. Junior established a contract-based right to parentage, as evidenced by the couple's collective intent and shared cost in conceiving a child with her wife, Ms. Glover, via assisted reproductive technology. Alternatively, I believe Ms. Junior established her parentage as a matter of equity.  Accordingly, I respectfully dissent.

The learned majority succinctly summarized the relevant facts and procedural history.  Accordingly, I do not reiterate them herein.  Similarly, the majority explained that while parentage is typically established biologically or through formal adoption, our High Court has recognized that in cases involving assistive reproductive technology, "contracts regarding the parental status of the biological contributors must be honored in order to prohibit restricting a

_____

* Retired Senior Judge assigned to the Superior Court.

person's reproductive options." Majority Memorandum at 7 (quoting **C.G. v. J.H.**, 193 A.3d 891, 903-04 (Pa. 2018) (cleaned up). As acknowledged by the High Court, "[t]here is nothing to suggest in our case law that two partners in a same-sex couple could not similarly identify themselves each as intended parents, notwithstanding the fact that only one party would be biologically related to the child." **Id**. at 904, n.11.

While my esteemed colleagues delineate the relative contractual obligations outlined between the parties in the Fairfax Cryobank Agreement that identified Junior as the "co-intended Parent" and the couple's in vitro fertilization ("IVF") agreement with RMA Fertility, that Junior executed as the "Partner," it did not address the contract between Mss. Junior and Glover concerning parentage—as cogently outlined in the trial court's comprehensive discussion of the party's mutual intent to establish Ms. Junior's parentage. **See** Trial Court Opinion, 8/1/22 at 9-10 ("Based upon the undisputed evidence presented, the [c]ourt determined that it conclusively established that the parties, a married couple, formed a binding agreement for Junior, as a non-biologically[-]related intended parent, to assume the status of legal parent to the [c]hild [conceived] through the use of assistive reproductive technology.").

As this Court recognized in **Reformed Church of the Ascension v. Hooven & Sons, Inc.**, 764 A.2d 1106, 1109 (Pa.Super. 2000), "[t]he policy behind contract law is to protect the parties' expectation interests by putting the aggrieved party in as good a position as he would have been had the

contract been performed." (citing Restatement (Second) of Contracts § 344(a) (1979) (approved in **Trosky v. Civil Service Commission**, 652 A.2d 813, 817 (Pa. 1995)). Whether oral or written, a contract requires three essential elements: (1) mutual assent; (2) consideration; and (3) sufficiently definite terms. **Helpin v. Trustees of Univ. of Pennsylvania**, 969 A.2d 601, 610 (Pa.Super. 2009).

> Furthermore,
>
> [a]n agreement is expressed with sufficient clarity if the parties intended to make a contract and there is a reasonably certain basis upon which a court can provide an appropriate remedy. Accordingly, not every term of a contract must always be stated in complete detail. If the parties have agreed on the essential terms, the contract is enforcible even though recorded only in an informal memorandum that requires future approval or negotiation of incidental terms. In the event that an essential term is not clearly expressed in their writing but the parties' intent concerning that term is otherwise apparent, the court may infer the parties' intent from other evidence and impose a term consistent with it.

**Id**. (cleaned up) (quotations and citations omitted).

Instantly, as highlighted by the trial court, the certified record is replete with evidence of the parties' mutual assent to conceive a child of their marriage using assisted reproductive technology, bestow upon Ms. Junior legal parent status, and to raise the child together as co-parents. **See** Trial Court Opinion, 8/1/22, at 9-10. Moreover, unlike the facts that the Supreme Court confronted in **C.G. supra**, where "[t]here was no dispute that [the former same-sex partner] was not party to a contract or identified as an intended-parent[,]" Ms. Junior satisfied both these components. In my mind, the only

question is whether the oral agreement was supported by consideration or some other form of validation. For the reasons that follow, I would find that it was.

As our Supreme Court explained in ***Pennsylvania Envtl. Def. Found. v. Commonwealth***, 255 A.3d 289, 305 (Pa. 2021), "Consideration is defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." (citations omitted).

During the evidentiary hearing on Ms. Junior's petition, Ms. Junior testified that she paid for one-half of all the expenses, including fees associated with the preliminary medical tests, in vitro fertilization, and hiring a doula to assist Ms. Glover during the birth. N.T., 5/3/22, at 17, 44. When asked about the extent of the equally shared costs, Ms. Junior declared, "**Everything**: the IVF, the doula, the second parent adoption, everything. Everything." ***Id***. at 44.

Ms. Junior also described her shared emotional role, noting how, for three months, she was required to administer daily fertility injections into Ms. Glover's abdomen in anticipation of having her eggs removed for fertilization. ***Id***. at 18-19. After the pregnancy was confirmed, Ms. Junior administered daily dosages of progesterone to help prevent miscarriages. ***Id***. at 19. Additionally, she regularly accompanied Ms. Glover to the obstetrician. ***Id***. at 20. In sum, she described their collective preparations as follows:

> But every week, we would have to go to RMA for more bloodwork just to make sure the progesterone levels were correct,

that everything was coming along [as planned], and also doing sonograms.

And then, finally, we had completed [the assisted reproductive technology]. Like I said, I gave the injections for over three months, but now we were able to go to directly to Thomas Jefferson, who we decided together would be our OB. That's where we would give birth.

. . . .

So, for a year, this was a constant -- for the entire year of 2021, us bringing our child into the world was a constant in our lives.

Although he – we weren't pregnant before July, he was still part of our family because we were doing everything we could every week to make sure that we had him. And then once we conceived, we were doing everything we could every day for the . . . remainder of the year to make sure that he stayed with us through these injections, through going to the hospital, making sure he was okay, monitoring his heart, hearing his heartbeat, so forth and so on.

I'm sorry I was long-winded, but really, it was a very long process, and I was there for every step of it.

*Id*. at 21-20.

Ms. Glover not only agreed to the shared financial and emotional burdens, she continued to assent to the arrangement even after doubting whether she was still committed to co-parenting with Ms. Junior. *Id*. at 59. Ms. Glover addressed this apparent dichotomy during the evidentiary hearing in explaining why, despite her apprehensions about continuing her romantic relationship with Ms. Junior, she nevertheless executed the fertility contracts identifying Ms. Junior as a co-parent rather than proceeding alone or forgoing the IVF program entirely: "I could've moved forward without having to do the

[IVF] program. . . . "Financially—it was the best decision." *Id*. at 65. Hence, the certified record bears out that, in exchange for the consideration of the shared emotional burden and equally divided financial cost of the assistive reproductive procedure and birth, Ms. Glover agreed that her spouse, Ms. Junior, would possess parental rights to the child conceived through their combined efforts.

In my view, the foregoing exchange of promises is not so vague or ambiguous to preclude a legal contract because one of the parties did not expect legal consequences to flow from their agreement. Indeed, in rejecting Ms. Glover's protestation that she, in fact, did not intend to bestow any legal rights upon Ms. Junior, the trial court was incredulous. It proclaimed, "[t]o the extent that Glover alleges she[, an attorney,] was unable to legally consent to a contract or understand the terms of the contracts that she signed, these allegations are either unproven, not credible [or] waived as she has not raised the same on appeal." Trial Court Opinion, 8/1/22, at 10.

The certified record sustains the trial court's credibility assessment. Indeed, approximately five months after Ms. Glover initiated the IVF program with Ms. Junior's financial contributions and emotional support, Ms. Glover ratified the couple's arrangement by executing a December 2021 affidavit, which noted the then-anticipated adoption and further endorsed Ms. Glover's desire for Ms. Junior to "become a legal parent, with rights equal to [Ms. Glover's] rights as a biological parent." Glover Affidavit, 12/2/21, at 1 ¶

4. The affidavit continued, "I want Nicole Shawan Junior to become a legal parent to this child because I believe it is in the best interest of the child." **Id**. at ¶10. In light of Ms. Glover's recurring statements of assent, I share the trial court's skepticism that Ms. Glover did not comprehend the extent of the agreement.

Thus, as outlined *supra*, I believe Ms. Junior has an enforceable right to parentage under principles of contract. The certified record demonstrates the parties' mutual assent, actions in furtherance of the agreement, and consideration. Accordingly, I respectfully disagree with the majority's determination that no enforceable contract conferred parental rights on Ms. Junior.

Furthermore, even if Ms. Junior did not have a contractual right to parentage, I believe that she warranted relief under the court's equitable power. Phrased differently, I would find that Ms. Glover's actions and representations regarding the child's anticipated parentage were grounds under the doctrine of equitable estoppel to preclude her from challenging Ms. Junior's parentage. My reasoning follows.

Equitable estoppel binds a party to the implications created by their words, deeds or representations. In **L.S.K. v. H.A.N.**, 813 A.2d 872, 877 (Pa.Super. 2002), we explained,

> Equitable estoppel applies to prevent a party from assuming a position or asserting a right to another's disadvantage inconsistent with a position previously taken. Equitable estoppel, reduced to its essence, is a doctrine of fundamental fairness designed to

preclude a party from depriving another of a reasonable expectation when the party inducing the expectation albeit gratuitously knew or should have known that the other would rely upon that conduct to his detriment.

*Id*. (cleaned up).

With this principle in mind, I detail the following evidence regarding estoppel. Herein, Ms. Glover represented over a thirteen-month period that she intended to share parentage of the couple's child conceived through assisted reproductive technology. As previously discussed, Ms. Glover contracted with Fairfax Cryobank and RMA Fertility and she assented to identifying Ms. Junior as the "co-intended Parent" and "Partner," respectively. Even after doubting her romantic commitment to Ms. Junior, Ms. Glover continued to pursue the pregnancy with Ms. Junior's financial assistance and shared emotional burden.

Ms. Glover further led her spouse to believe that they would share parentage. Ms. Junior participated in the decision to conceive their son with the shared intent to raise him together. Likewise, she consistently held herself out as an intended parent, and with Ms. Glover's express consent and endorsement, Ms. Junior performed the role of an expectant parent, including participating in the selection of the sperm donor and naming their child after conception. During the evidentiary hearing, Ms. Junior testified that, in her role as the "co-intended Parent" under Fairfax Cryobank contract, the couple collectively selected a sperm donor from Fairfax Cryobank based specifically on the donor's physical appearance, interests, and genetic pedigree. *Id*. at

She explained, "We were looking for sperm donors who . . . resembled me as much as possible, because we . . . were us[ing] [Ms. Glover's] egg, and we wanted our child to look as much like both of us as possible." *Id*. Thus, in identifying a photograph of the sperm donor, Ms. Junior observed, "he's dark-skinned, like I am. He has almond shaped eyes like I do. He has a huge . . . wide smile like I do. He has high cheekbones like I do. In addition to that when we looked more deeply into the details, he's a Sagittarius like I am." *Id*. at 26. In addition, both the donor and Ms. Junior traced their indigenous history to Benin, Africa. *Id*. Overall, she stated, "primarily, it was because . . . we shared so much in common—the donor and I—and [Ms. Glover] and I both kept remarking on how [it was] kismet. . . [.]" *Id*.

From my perspective, Ms. Glover's actions and representations throughout the technologically-assisted pregnancy demonstrated her assent to Ms. Junior's parentage. Ms. Junior relied upon these actions and representations to her detriment and would be severely prejudiced if Ms. Glover were permitted to deny parentage at this juncture. Thus, in addition to affirming the trial court's analysis of the parties' respective contractual rights, I would find the alternative grounds to affirm the trial court's order as a matter of equity.[1]

---

[1] It is axiomatic that this Court can affirm the trial court order for any reason supported by the certified record. *D.M. v. V.B.*, 87 A.3d 323, 330 n.1 (Pa.Super. 2014).

Finally, while I believe that we should affirm the trial court order for the above-stated reasons, I also note that this case presents a perfect opportunity for the High Court to delineate the proper application of "intent-based parentage" as the High Court outlined the principle in **C.G.**, **supra**. The **C.G.** Court was asked to confront whether an unmarried former same-sex partner had standing as a "parent" pursuant to § 5324(1) of the Child Custody Act. In rejecting the former partner's standing claim, the Court held that Pennsylvania jurisprudence limits recognition of legal parentage to biology, adoption, judicial presumptions associated with intact marriages, and "contract—where a child is born with the assistance of a donor who relinquishes parental rights and/or a non-biologically related person assumes legal parentage[.]" **Id**. at 904. As the former partner had no biological connection to the child, had not officially adopted the child, and did not have contract rights that have been recognized as affording legal parentage by way of contract, the High Court concluded that she was not a parent.

Significantly, however, the Court continued:

[N]othing in today's decision is intended to absolutely foreclose the possibility of attaining recognition as a legal parent through other means. However, under the facts before this Court, this case does not present an opportunity for such recognition, **as the trial court found as fact that the parties did not mutually intend to conceive and raise a child, and the parties did not jointly participate in the process.**

**Id**. at 904 n.11 (emphasis added).

In their respective concurring opinions, Justices Dougherty and Wecht outlined their perspectives of intent-based parentage, but nonetheless agreed that the factual record did not warrant its application in that case. In this vein, Justice Dougherty reasoned that it was not necessary "to endorse any particular new test" because the Court was bound by the factual findings that there was no mutual intent to conceive and raise a child, or evidence of shared participation in the reproductive process. As stated by the esteemed Justice Dougherty, those findings "preclude a holding that C.G. has standing as a parent under any of the proffered definitions of intent-based parentage." *Id*. at 913.

Justice Wecht argued that "[r]eliance solely upon biology, adoption and contracts is insufficient" in some situations and articulated his comprehensive perspective that, "in cases involving assisted reproductive technologies ("ART"), courts must probe the intent of the parties." *Id*. at 913-14 (footnote omitted). However, he too was constrained to concur with the Majority's decision based upon the trial court's findings of fact. The learned justice explained,

> While I would embrace an intent-based test for parentage for persons pursuing parentage through ART, I nonetheless concur with the Majority's determination that C.G. was not a parent under the facts of this case as found by the trial court. As the Majority notes, the **trial court found that J.H. was credible when she testified that C.G. never intended to be a parent to Child and that C.G. did not act as a parent**. Further, the trial court credited testimony that **C.G. and J.H. reached no mutual decision to become parents.** Given that there was no documentary evidence of C.G.'s intent to parent, and given that

- 11 -

the trial court found, consistent with the record, that C.G.'s actions were not those of a parent, I join the Majority's conclusion that C.G. did not have standing as a parent pursuant to 23 Pa.C.S. § 5324.

*Id*. at 917 (emphases added, footnotes omitted). Overall, Justice Wecht concluded, "I think that today's case is a missed opportunity for this Court to address the role of intent in analyzing parental standing in ART cases." *Id*. at 918.

Thus, although I would affirm the trial court order establishing Ms. Junior's parentage, insofar as my position failed to garner the support of a majority of my colleagues on this panel, I highlight the opportunity for the Supreme Court to consider the issue of intent-based parentage within the factual framework that was missing in *C.G.* Stated plainly, the case at bar presents the necessary facts to serve as the paradigm for the High Court to affirm the viability of intent-based parentage in cases involving assisted reproductive technology where the couple not only evidenced their mutual intent to conceive and raise the child, but they also participated jointly in the process.