J-A03025-25

2025 PA Super 142

| | | |
|---|---|---|
| DAJAH HAGANS, AS PARENT AND NATURAL GUARDIAN OF J.H., A MINOR, INDIVIDUALLY AND IN HER OWN RIGHT. | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : | |
| HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA, UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, KRISTEN LEITNER, M.D., JULIE A. SAYAMA, M.D., WHITNEY R. BENDER, M.D., SARAH GUTMAN, M.D., DENISE JOHNSON, M.D., JESSICA PETERSON, M.D., AND VICTORIA KROESCHE, R.N. | : : : : : : : : : : : : : : : | No. 536 EDA 2024 |
| APPEAL OF: HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA | : : | |

Appeal from the Judgment Entered January 19, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  190607280

BEFORE:  STABILE, J., McLAUGHLIN, J., and LANE, J.

OPINION BY McLAUGHLIN, J.:                    **FILED JULY 10, 2025**

Hospital of the University of Pennsylvania ("HUP") appeals from the

judgment entered in favor of Dajah Hagans ("Plaintiff" or "D.H."), as parent

and natural guardian of J.H., and against it. HUP alleges the trial court erred

in its denial of HUP's motion for judgment notwithstanding the verdict

("JNOV"), in certain evidentiary rulings, and in its rulings related to the verdict

slip. HUP also claims the verdict was against the weight of the evidence and that the court erred in not granting remittitur. We affirm.

In February 2018, D.H. was pregnant with J.H. Her water broke around 11:30 a.m. on February 22, 2018, and an ambulance took her to HUP. Within three hours of arrival, D.H. gave birth to J.H. by cesarean section ("C-section"). J.H. had a brain injury at birth, and was moved to intensive care and then transferred to Children's Hospital of Philadelphia ("CHOP").

J.H. has moderate to severe cerebral palsy and lost significant brain function. He is nonambulatory, cannot speak, has cortical visual impairment, poor control over his limbs, and is fed through a gastrostomy tube. J.H. depends on caregivers to feed, toilet and clean him. Further, he faces a lifetime of growth-related and orthopedic issues, including scoliosis, painful spasticity, muscle tightness and joint pain. *See* Trial Ct. Op., filed Jan. 22, 2024, at 3-4.

The trial court summarized the evidence at trial as the following timeline of key events:

> 1. One month prior to delivery, J.H.'s fetal heart rate is at a baseline of 130. The fetal heart strips, in addition to a normal baseline showed normal variability accelerations and no decelerations. In sum, J.H. was getting enough oxygen.
>
> 2. In the early morning hours of delivery day, D.H. who was past her due date, went into labor, and her water broke. Later in the morning an ambulance was called.
>
> 3. At 11:30 a.m. D.H. is in the ambulance on the way to HUP. D.H.'s vital signs were normal (heart rate, blood pressure, respiratory). According to Doctor Michael Cardwell (Plaintiff's expert in maternal[-fetal] medicine) during the

ambulance ride, there is no evidence of infection in D.H. as her heart rate was normal. D.H.'s temperature was not taken in the ambulance.

4. D.H. arrives at HUP at 11:45 a.m. where she is triaged. Hospital notes indicate D.H. is having contractions but has no vaginal bleeding or cardiorespiratory distress. According to [Plaintiff's expert in obstetrics and maternal-fetal medicine], Dr. [Michael] Cardwell, that means D.H. looks healthy.

5. However, upon admission to HUP, D.H. presents with a temperature of 100.9 indicating fever, and J.H.'s heart rate (a fetal heart monitor has now been attached) is elevated at 180. A cervical exam determined that D.H. was dilated 7 centimeters indicating active labor. D.H.'s blood pressure was also elevated. The resultant admissions diagnosis for D.H. was chorioamnionitis "based on her fever and fetal tachycardia as well as maternal tachycardia."

6. At noon D.H. received supplemental oxygen, and at 12:03 p.m. an I.V. infusing fluid was attached. By 12:12 p.m. D.H. was transferred from the Pregnancy Emergency Room to the adjacent Labor and Delivery Unit. There, the fetal heart tracing of all patients, such as that tracking J.H.'s heart rate, was visible to the healthcare providers on large screens in the multi-purpose room, the nursing station, and could be accessed in the patients' room.

7. The attending physician, Dr. Kirstin Leitner (responsible for direct patient care and supervising the residents) for the first time, went to see D.H. between 12:15 p.m. and 12:45 p.m. According to Dr. Leitner, before she went to see D.H. "we would have discussed her presentation to triage, the diagnosis that she had received of chorioamnionitis, and we would have reviewed her tracing." "We" was defined by Dr. Leitner as "the whole team; Dr. Gutman, who was the doctor there that day, running the floor, as well as Dr. Suyama, who wrote the [history and physical exam notes]." Dr. Leit[ner] did not see D.H. again until the [c]esarean was performed. Around the time of Dr. Leitner's initial visit with D.H., the labor and delivery plan was put in place. The plan, by all accounts a good plan, was to deliver J.H. vaginally, however with a Category II tracing, they would continue with resuscitative efforts (such as IV fluids and

repositioning) and consider a C-section if the tracing did not improve.[3] In between Dr. Leitner's initial visit and delivery, the residents, Doctors Gutman and Bender saw D.H.

> [3] Dr. Leitner's testimony was primarily based on what would normally have been what is done, usually done. The only specific recollections of Dr. Leitner about D.H. and J.H. was "she was admitted with chorioamnionitis . . . and . . . that her baby had been transferred to the intensive care nursery after delivery, which is not a common thing to happen or was an unexpected outcome of her delivery."

8. D.H. was given medication between admission and delivery. One of which was Unasyn (ampicillin/sulbactam combination) and Tylenol. According to hospital records Unasyn was administered by Defendant, Nurse Kroesche, at 12:30 p.m., to treat the chorioamnionitis. The timing, at 12:30 p.m., of the Unasyn administration was greatly disputed as there was an anesthetic note charted that the medication (a fluid administered through the IV) was still infusing, at 2:30 p.m. when D.H. was enroute to delivery. The significance being as to whether the antibiotics were administered timely because if delivered at 12:30, the fluids should have been in D.H by 1:00 p.m. This was an area of dispute at trial.

9. Pitocin, considered by HUP according to its own protocols, to be a high-risk medication, and to be closely monitored, was administered to D.H. to augment the progress of labor. D.H. had not made much progress toward a vaginal delivery and was in unrelenting excruciating pain. The goal of using Pitocin "is to have strong and frequent contractions to achieve cervical change." The decision to use Pitocin, according to Defendant, Dr. Bender, was "our team's plan. . . (our team . . . was Dr. Gutman, myself and Dr. Leitner), and the medication was administered at 1:53 p.m. According to Dr. Bender, the Pitocin "was very quickly turned off," discontinued after ten minutes[4] because the heart monitor strips indicated periods of recurrent and prolonged decelerations: to wit, decreased oxygen to J.H. Thereafter, the team (Doctors Bender, Gutman and Leitner) decided it was time for a [c]esarean delivery, and the C-section was ordered by Doctor Bender at 2:05 p.m. (the chart says 2:11 p.m.). Doctor Bender charted the reason for

the C-section as "[n]on-reassuring electronic fetal monitoring tracing," claiming that was the only "preselected option" in the drop-down menu. Category II tracing was not a drop-down menu option (per Dr. Bender, in this case "non reassuring electronic fetal monitoring" refers to Category II tracing). According to Doctor Leitner, it was her plan to proceed to a level 2 C-section (to be in the operating room within 30 minutes); and the decision was made "due to the significant change in the heart tracing and recurrent late decelerations . . ."

[4] Dr. Bender agreed that HUP's medical records "indicate the Pitocin administration was continuous," and there were no notations from her, or anyone else on the team, that the Pitocin was stopped. This is indicative of the many instances where HUP's healthcare providers rely on conjecture and speculation about what actually occurred with D.H. and J.H. Much is based on what they usually do.

10. At 1:20 p.m. D.H. was given an epidural for pain; it did not provide relief. Since the epidural proved to be inadequate, the decision was made to move to general anesthesia for the [c]esarean surgery.

11. As discussed above, HUP's medical team called for the C-section delivery shortly after 2:00 p.m., and baby J.H. was delivered at 2:36 p.m. Plaintiff proved that J.H. should have been delivered at 1:30 p.m., which was after a prolonged deceleration of over four minutes evidenced from the heart monitor strips. The C-section should have been called by 1:08 p.m. to avoid further lack of oxygen to J.H.

*Id.* at 4-8 (citations omitted).

During trial, the parties stipulated that the individual defendants – Kirstin Leitner, M.D., Whitney Bender, M.D., Sarah Gutman, M.D., Julie Suyama, M.D., and Victoria Kroesche (collectively, "Individual Defendants") were acting within the scope of their employment with HUP when delivering care to D.H. and J.H.:

> Ladies and gentlemen of the jury, it has been stipulated between the parties that the defendants, the individual defendants in this case Kirstin Leitner, M.D., Whitney Bender, M.D., Sarah Gutman, M.D., Julie Suyama, M.D., and Victoria Kroesche, the nurse, were agents and servants of the hospital, acting within the scope of their employment, when they delivered care to Ms. Hagans and Baby Jay.

N.T., Apr. 11, 2023 a.m., at 8.

Plaintiff's life care planner, Jody Masterson, testified as to the care J.H. would require in his life. She provided different care scenarios, including plans for residential care and at-home care. N.T., Apr. 3, 2023 p.m., at 27-71. Masterson used general life tables for the purposes of her report, and the tables were admitted into evidence. *Id.* at 37; N.T., Apr. 11, 2023 a.m., at 17-18. Masterson did not offer an opinion as to J.H.'s life expectancy. N.T., Apr. 3, 2023 p.m., at 38. Economic consultant Thomas Borzilleri testified that under the life expectancy tables, a normal life expectancy for a male would be 75 years of age. N.T., Apr. 10, 2023 a.m., at 58. Dr. Katz testified that an inability to walk decreases a person's life expectancy by five to 10 years. *Id.* at 114-15. Defense expert Mark Mintz, M.D., testified that J.H. would have a life expectancy of 29 years of age. Trial Exh. 100, Dep. of Mark Mintz, M.D., at 107.

Plaintiff's expert in obstetrics and maternal-fetal medicine, Dr. Michael Cardwell, testified that in his opinion, "the health care providers involved in [D.H.'s] care should have recognized a non-reassuring fetal heart rate pattern and recommended and moved to deliver the baby in a timely fashion by an appropriate [C-]section, that would have been around 1:30 or so in the

afternoon." N.T., Apr. 4, 2023 p.m., at 10. He opined that if "a timely [C-]section been done around 1:30, the baby would have been born in a healthy condition and would not have suffered the effects of hypoxic ischemic encephalopathy or HIE." *Id.* at 11.

Dr. Cardwell provided opinions as to deviations from standards of care. He testified to a reasonable degree of medical certainty "that the health care providers, the doctors, the resident, the supervising attending, all deviated from the standard of care of treatment of Ms. Hagans and her unborn baby during her labor and delivery." *Id.* at 49. He explained that the resident, Dr. Suyama, stated in a triage note approved by the attending physician, Dr. Leitner, that when Hagans arrived at the hospital, she had a temperature of 100.9°F, which constituted a fever. Dr. Suyama also documented fetal heart monitor tracing showing fetal tachycardia, which is a heart rate that is too high. *Id.* at 17. The physicians believed that Hagans was developing an infection in her uterus called chorioamnionitis. *Id.* at 10, 18, 82-83. Dr. Cardwell said that the fetal tracing of tachycardia is considered "non-reassuring," and Dr. Leitner signed off on a plan to engage in "resuscitative efforts," which could include giving Hagans oxygen, providing her with extra intravenous fluids or an IV, or turning her from side to side. *Id.* at 18. However, if the tracing did not show improvement, the plan was to perform a C-section. *Id.* at 18-19.

After approving the plan around noon, Dr. Leitner was not involved in Hagans' care again until Hagans was taken to the operating room for the C-

section, approximately two and a half hours later. *Id.* at 19-20, 21. In the interim, she left Hagans in the care of Drs. Suyama, Bender, and Gutman. *Id.* at 78-79. Dr. Cardwell testified that Dr. Leitner's failure to conduct a direct evaluation of Hagans between the initial examination and the C-section was a breach of the standard of care. *Id.* at 20.

The fetal heart monitoring tracing then showed decreased to "absent variability" – essentially a flatter line – and a prolonged deceleration of the baby's heart rate around 1:00 p.m. *Id.* at 21-24, 33. Dr. Cardwell opined that the fetal tachycardia, decreased minimal variability, and heart deceleration signaled that the baby was not getting enough oxygen to his brain, and the doctors caring for Hagans should have called for an emergency C-section at about 1:08 p.m. *Id.* at 26, 27, 28. Dr. Cardwell explained that if the baby had been delivered by an emergency C-section at that time, he would have been born healthy. *Id.* at 27-28. However, they did not call the C-section until 2:11 p.m. *Id.* at 31. Dr. Gutman discussed the need for the C-section with Hagans and obtained her agreement at 2:11 p.m. N.T., 4/12/23 p.m., at 53; Ex. D-1A at 67-68.

The monitoring was removed 13 minutes later, at 2:24 p.m., and the baby was delivered by C-section 12 minutes later, at 2:36 p.m. When the C-section was ordered and as they prepared for the C-section, the amniotic fluid was still clear. N.T., 4/4/23 p.m., at 30-31. However, by the time of delivery, the fluid was clouded with meconium, which is the baby's fecal matter. *Id.* at 30. Dr. Cardwell explained that low oxygen will cause the baby to release

meconium. *Id.* at 31. The C-section was not called until 2:11 p.m. because of the non-reassuring fetal monitor tracing, even though the tracing was non-reassuring the entire time. *Id.* at 31-32. In Dr. Cardwell's opinion, and consistent with the note Dr. Leitner signed stating that if the tracing did not improve they would do a C-section, the baby should have been delivered much earlier, no later than the prolonged deceleration around 1:00 p.m. *Id.* at 33. Dr. Cardwell said that in his expert opinion, if the baby had been delivered around 1:30, he would have been born healthy and not suffered the ischemic injury. *Id.*

Plaintiff's expert in neonatology, Dr. Erin Zinkhan, testified that the result of the arterial cord gas test was "by itself . . . not terribly concerning." N.T., Apr. 5, 2023 p.m., at 6. However, she opined that the test was not of arterial cord gas, but rather venous cord gas. *Id.* She testified that "[t]he significance of that is that in a case of HIE where the baby is not getting enough oxygen, you can have a relatively normal or just very slightly abnormal cord venous gas and get a very abnormal cord arterial gas that shows there's lots of acid accumulating in the baby's body." *Id.* at 6-7.

However, the defense expert in obstetrics and maternal-fetal medicine, Dr. Laura Goetzl, disputed Dr. Zinkhan's interpretation of the cord blood gas results. Dr. Goetzl opined that, based on the cord gas value, there was "no low oxygen at the time of the baby's birth" and no evidence of an acute hypoxic or low-oxygen event when D.H. was at HUP. N.T., Apr. 17, 2023 a.m., at 38. She further testified that Dr. Zinkhan's opinion that it was a venous

sample was "pure speculation." **Id.** at 71. Dr. Goetzl stated that the "values match what you would expect to see for an arterial cord gas," and therefore "guessing that they are incorrect in that they came from a different blood vessel is pure speculation." **Id.** She testified that there was nothing in the fetal monitoring that would lead her to believe it was a venous sample. **Id.**

Dr. Leitner testified about the care D.H. received at HUP and stated that there was no indication that they should have performed the C-section earlier. N.T., Apr. 11, 2023 a.m., at 25-98, N.T., April 11, 2023 p.m., 4-53. When defense counsel asked her about the cord blood gas, Plaintiff objected that Dr. Leitner was a "fact witness who would not have had that information in real[ ]time." **Id.** at 82. Plaintiff therefore argued any opinion as to the cord blood gas was an opinion formed in anticipation of litigation, which would be an improper expert opinion. **Id.** The trial court sustained the objection. **Id.** at 52.

During the charging conference, HUP objected to a question on Plaintiff's proposed verdict slip asking if "the conduct of [HUP], acting by and through the obstetrical team of doctors and nurses," fell below the standard of care. HUP maintained that the verdict slip should ask separately whether each defendant was negligent, and if so, whether that negligence was a cause of the injuries. **See** N.T., Apr. 19, 2023 p.m., at 32. HUP conceded that it had stipulated that the individual defendants were HUP's agents, and were acting within the course and scope of their employment, but argued that Plaintiff still bore the burden of proving whether each individual defendant's conduct fell

below an applicable standard of care. ***See id.*** at 32-33;[1] N.T., Apr. 20, 2023

a.m., at 27-29.[2] The trial court decided to use a modified version of Plaintiff's

proposed question, adding the names of the individual defendants:

> Do you find that the conduct of the Hospital of the University of Pennsylvania, acting by and through Dr. Kirstin Leitner, Dr. Whitney Bender, Dr. Sarah Gutman, Dr. Julie Suyama, and Nurse Victoria Kroesche, fell below the applicable standard of care? In other words, was the Defendant negligent?

N.T., Apr. 20, 2023 a.m., at 4, 34; Trial Work Sheet, filed 4/26/23. HUP did

not object to the proposed instruction on vicarious liability.

HUP also objected to a portion of Plaintiff's proposed verdict slip that

asked about factual cause and increased risk of harm as separate questions.

HUP maintained that doing so was improper because increased risk of harm

"is factual cause":

> [Defense Counsel]: I'm going back to proposed Jury Instruction 20 from the plaintiffs. Increased risk of harm is still factual cause. It's another way to prove factual cause. It's not a separate basis for causation under the verdict slip. There should be one question about factual cause. The jury is instructed on increased risk of harm.
>
> I've never seen anybody try to break out increased risk of harm on a verdict slip like this before, and certainly

---

[1] Prior to trial the parties stipulated that the claims against Dr. Suyama were dismissed with prejudice, that Dr. Suyama was an employee and agent of HUP, and that Hagans did not dismiss any vicarious liability claims against HUP. Stipulation, filed Mar. 29, 2023.

[2] Throughout trial, HUP and the Individual Defendants were represented by the same lawyer. Due to a conflict of interest, HUP brought in separate counsel to argue the individual defendants should remain on the verdict slip. N.T., Apr. 20, 2023 a.m., at 20.

increased risk of harm is part of many malpractice cases. We do not believe that is appropriate.

. . .

. . . No. 2 under this charge specifically indicates the factual-cause question. And I understand there is a jury charge that addresses increased risk of harm, but it should not be included in the verdict form because that is factual cause. It's another way of reaching factual cause. And it would be unfair and prejudicial to include that on the verdict slip.

THE COURT: But there was testimony in this case to that effect. Correct?

[Defense Counsel]: I understand, Your Honor, but there typically is in malpractice cases, and that language is never included in the verdict slip. The jury is simply asked to determine factual cause. They are instructed by Your Honor on how to do that, based on the law. And there really is no basis to include additional language on increased risk of harm on the verdict slip.

N.T., Apr. 20, 2023 a.m., at 7-13. Plaintiff ultimately offered to merge the two questions together, and the court ordered her to do so. The verdict slip submitted to the jury asked whether HUP's negligence was "a factual cause of the harm to [J.H.]," and/or increased the risk of harm to him. Verdict Slip; R.R. 983a.

The trial court instructed the jury as follows as to professional negligence:

Professional negligence consists of a negligent, careless or unskilled performance by a physician of the duties imposed on him or her by the professional relationship with the patient. It is also negligent when a physician shows a lack of proper care and skill in the performance of a professional act. A nurse owes a duty of care to conduct himself or herself as a reasonably prudent nurse would act under the circumstances.

- 12 -

You have heard testimony that one or more of the defendant physicians were residents. A resident is a licensed physician receiving training in a specialty in a hospital. Residents are held to exercise that degree of skill, learning and care normally possessed by a resident with the same level of training. Under this professional standard of care, a physician must also keep informed of the contemporary developments in the medical profession in his or her specialty and must use these current skills and knowledge. A resident physician is not required to meet the same standard of care as a fully-trained specialist in his or her field.

A physician must have the same knowledge and skill and use the same care normally used in the medical profession. A physician whose conduct falls below the standard of care is negligent. A physician who professes to be a specialist in a particular field of medicine must have the same knowledge and skill and use the same care as others in that same medical specialty. A specialist whose conduct does not meet this professional standard of care is negligent.

Under this standard of care, a physician must also keep informed of the contemporary developments in the medical profession in his or her specialty and must use current skills and knowledge. In other words, a physician must have up-to-date medical skills and knowledge, and if he or she fails to keep current or fails to use current knowledge in the medical treatment of the patient, the physician is negligent.

N.T., Apr. 20, 2023 p.m., at 23-25.

The trial court instructed as to factual cause and increased risk of harm,

including the following instruction:

In order for the plaintiff to recover in this case, the defendant's negligent conduct, if you so find, must have been a factual cause in bringing about that harm. Conduct is a factual cause of harm when the harm would not have occurred absent the conduct. To be a factual cause, the conduct must have been an actual, real factor in causing the harm even if the result is unusual or unexpected. A factual cause cannot be an imaginary or fanciful factor having no

connection or only an insignificant connection with the harm.

To be a factual cause, the defendant's conduct need not be the only factual cause. The fact that some other causes concur with the negligence of the defendant in producing an injury does not relieve the defendant from liability as long as his or her own negligence is a factual cause of the injury.

When a defendant physician negligently fails to act or negligently delays in taking -- strike that. Let me start over.

When a defendant physician negligently fails to act or negligently delays in taking indicated diagnostic or therapeutic steps, then his or her negligence is a factual cause of injuries to the plaintiff and that negligent defendant physician is responsible for the injuries caused. Where the plaintiff presents expert testimony that the failure to act or delay on the part of the defendant physician has increased the risk of harm to the plaintiff, this testimony, if found to be credible, provides a sufficient basis for which you may find that negligence was a factual cause of the injury sustained.

If there has been any significant possibility of avoiding injuries and the defendant has destroyed that possibility, they may be liable to the plaintiff. It is rarely possible to demonstrate to an absolute certainty what would have happened under circumstances that the wrongdoer did not allow to come to pass.

*Id.* at 25-27.

The jury found against HUP and in Plaintiff's favor. The jury awarded $182,737,791.00 in damages. HUP filed post-trial motions, which the trial court denied. Following the award of delay damages, Plaintiff entered judgment against HUP for $207,628.10. HUP timely appealed.[3]

_____

[3] The Individual Defendants also appealed. We address that appeal at Docket No. 766 EDA 2024.

HUP raises the following issues:

1. Whether the trial court erred and/or abused its discretion in denying HUP's request for JNOV on Plaintiff's claim of vicarious liability, where Plaintiff failed to ask the jury to determine, and the jury never determined, the liability of any agent or employee of HUP, and the individuals for whom HUP was purportedly vicariously liable were exonerated and/or the claims against them were abandoned or waived before the case went to verdict?

2. Whether the trial court erred and/or abused its discretion in denying HUP's request for JNOV, where Plaintiff failed to prove that any agent or employee of HUP breached an objective standard of care that caused Plaintiff's or J.H.'s harm?

3. Whether the trial court erred and/or abused its discretion in denying HUP's motion for new trial, where Plaintiff failed to ask the jury to determine, and the jury never determined, the liability of any agent or employee of HUP, and the individuals for whom HUP was purportedly vicariously liable were exonerated and/or the claims against those individuals were abandoned or waived before the case went to verdict?

4. Whether the trial court erred and/or abused its discretion in submitting a patently erroneous verdict slip that allowed the jury to find causation if it concluded that HUP's negligence was the factual cause "and/or" increased the risk of harm to Plaintiff?

5. Whether the trial court erred and/or abused its discretion when it precluded the defendant physician's testimony regarding J.H.'s cord blood gas results and such evidence was essential to the defense?

6. Whether the trial court erred and/or abused its discretion in denying HUP's motion for new trial, a new trial on damages, or remittitur, where the noneconomic pain and suffering, and future medical expense awards were not supported by competent evidence or expert testimony, were against the weight of the evidence, were manifestly excessive, and shock the conscience?

HUP's Br. at 5-6 (suggested answers omitted).[4]

I.    Motion for JNOV

In its first two issues, HUP maintains the trial court erred in denying its motion for JNOV. We will address the claims together.

Review of the denial of JNOV presents a question of law. Our standard of review is *de novo* and our scope of review is plenary. **Bert Co. v. Turk**,

_____

[4] The Individual Defendants filed a brief in this appeal "to adopt and incorporate by reference the arguments made by HUP in its Appellant Brief, seeking Judgment notwithstanding the verdict, a new trial on all issues, a remittitur or a new trial as to damages, or a reduction of the medical expense award to present value in the event that Plaintiff contends (or this Court finds) that the jury verdict and/or the Judgment somehow applies to the Individual Defendants (which the Individual Defendants adamantly deny)." Individual Defendants' Br. at 1-2.

Hospital and Health System Association of Pennsylvania in Support of Appellant Hospital of the University of Pennsylvania filed an *amicus curiae* brief maintaining that vicarious liability requires a finding of liability as to an individual defendant and arguing that allowing a team theory expanded the doctrine and created a rule of absolute liability against the hospital.

The Pennsylvania Coalition for Civil Justice Reform, Pennsylvania Chapter of the American College of Physicians, American Academy of Pediatrics, St. Luke's University Health Network, American Property Casualty Insurance Association, and Insurance Federation of Pennsylvania filed an *amicus* brief claiming the jury's award of noneconomic damages was unsupported and contradicted by the evidence. It further wrote of the "ongoing and increasing trend toward astronomically large verdicts, and astronomically large awards of noneconomic damages, in Pennsylvania." Pa. Coalition for Civil Justice Reform Br. at 5. It maintains there are no meaningful standards by which to calculate the noneconomic damages awards.

The American Medical Association and the Pennsylvania Medical Society filed an *amicus* brief arguing that the verdict slip improperly conflated factual cause and increased risk of harm.

257 A.3d 93, 109 (Pa.Super. 2021); **Betz v. Erie Ins. Exch.**, 957 A.2d 1244, 1262 (Pa.Super. 2008).

"A motion for JNOV challenges the sufficiency of the evidence presented at trial." **Koller Concrete, Inc. v. Tube City IMS, LLC**, 115 A.3d 312, 321 (Pa.Super. 2015). JNOV is appropriate where either the movant is entitled to judgment as a matter of law or "the evidence was such that a verdict for the movant was beyond peradventure." **Braun v. Wal-Mart Stores, Inc.**, 24 A.3d 875, 891 (Pa.Super. 2011) (citation omitted), *aff'd*, 106 A.3d 656, 658 (Pa. 2014). In deciding a motion for JNOV, the court must consider the evidence in the light most favorable to the verdict winner. **Id.** at 890. Review does not involve an assessment of the weight of the evidence or any conflicts therein. **Koller Concrete, Inc.**, 115 A.3d at 321. JNOV is an "extreme remedy" that should only be granted in a clear case. **Id.** "If there is any basis upon which the jury could have properly made its award, the denial of the motion for [JNOV] must be affirmed." **Braun**, 24 A.3d at 891 (citation omitted).

HUP first argues the verdict must be vacated because Plaintiff failed to ask the jury to determine the liability of any agent or employee of HUP, which, HUP claims, is a necessary predicate to a finding of vicarious liability. HUP argues a vicarious liability claim is inseparable from the claim against a tortfeasor and therefore can only occur where there is a cause of action against an employee or agent. It notes the verdict slip it submitted would have required a finding as to each Individual Defendant. HUP acknowledges that it

stipulated the Individual Defendants were agents, but maintains that Plaintiff still had to prove the causative negligence of the employees. It further maintains there is no such theory as "team liability," claiming Pennsylvania has never recognized such a theory and other jurisdictions have found hospitals not liable based on the conduct of a group. It maintains having the jury determine liability "by and through" other defendants is not proper, as this would eliminate *respondeat superior* as a concept. In HUP's view, Plaintiff abandoned her claims against the Individual Defendants and because she failed to request a voluntary nonsuit or obtain leave to do so during trial, the claims against Individual Defendants must be dismissed with prejudice.

In its second issue, HUP argues Plaintiff failed to prove liability against any Individual Defendant because she failed to adduce evidence of the standard of care, a breach of the standard of care, or the harm caused by the alleged breach. It argues Plaintiff offered Dr. Cardwell to establish the standard of care for all attending and resident physicians and the nurse, even though he was certified in only maternal-fetal medicine. HUP further claims Dr. Cardwell did not testify to specific objective standards of care for each provider, rather testifying that the providers "as a team[] deviated from some unidentified standard of care." HUP's Br. at 29 (internal quotation marks omitted). It maintains Plaintiff failed to establish any individual breached a standard of care that applied to them, noting that the different defendants, that is, attendings, residents, and nurses, are held to different standards of care. HUP also maintains Plaintiff failed to establish causation because

Plaintiff's experts did not explain how or why an earlier delivery would have prevented the injuries. It further claims the experts testified without any foundation in fact or science.

Medical malpractice is "defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." **Grossman v. Barke**, 868 A.2d 561, 566 (Pa.Super. 2005) (quotation marks and citations omitted). To establish a medical malpractice claim, a plaintiff must prove: a "duty owed by the physician to the patient, a breach of that duty by the physician, that the breach was the proximate cause of the harm suffered, and the damages suffered were a direct result of the harm." **Id.** (quoting **Toogood v. Rogal**, 824 A.2d 1140, 1145 (Pa. 2003) (op. announcing judgment of court)). To carry that burden, "a medical malpractice plaintiff must present expert testimony to establish the applicable standard of care, the deviation from that standard, causation and the extent of the injury." **Id.** (citation omitted).

Vicarious liability is a "policy-based allocation of risk":

> Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that [it] possibly can to prevent it. Once the requisite relationship (i.e., employment, agency) is demonstrated, the innocent victim has recourse against the principal, even if the ultimately responsible agent is unavailable or lacks the availability to pay.

***Scampone v. Highland Park Care Ctr., LLC***, 57 A.3d 582, 597 (Pa. 2012) (citations and quotation marks omitted). Therefore, "to hold an employer vicariously liable for the negligent acts of its employee, these acts must be 'committed during the course of and within the scope of the employment.'" ***Sokolsky v. Eidelman***, 93 A.3d 858, 864 (Pa.Super. 2014) (quoting ***Sutherland v. Monongahela Valley Hosp.***, 856 A.2d 55, 62 (Pa.Super. 2004)). A plaintiff need not proceed against the individual employees to recover against the employer under a theory of vicarious liability. ***Id.*** at 866.

In ***Sokolsky***, the trial court granted the defendant's summary judgment motion in a legal malpractice action. In addressing the underlying medical malpractice claim, the trial court had found the plaintiff failed to establish the vicarious liability claim because she did not specify the hospital and nursing home staff member that breached a duty of care. We concluded the trial court had erred. We explained that "[s]imply because employees are unnamed within a complaint or referred to as a unit, *i.e.*, the staff, does not preclude one's claim against their employer under vicarious liability if the employees acted negligently during the course and within the scope of their employment." ***Id.*** at 866. We concluded:

> [B]oth Manor Care and Lehigh Valley may be subject to vicarious liability for the negligent acts and omissions of its staff regarding the quality of care it rendered to [the plaintiff]. This vicarious liability attaches to Manor Care and Lehigh Valley regardless of [the plaintiff's] attack of an individual member of either entity's nursing staff. Granted, [the plaintiff] will need to establish during trial that the staff breached a duty owed to her, and that this breach caused

her to suffer damages in order for her to recover on her legal malpractice action.

*Id.*

Here, the trial court concluded sufficient evidence supported the verdict:

> Throughout this combative litigation, during the course of this lengthy trial, and, up until the matter was ready to be sent to the jury for deliberation, HUP fully purported and embraced its vicarious relationship with its medical team. That relationship was transparent through the joint trial and legal representation of all Defendants, the numerous defense "team references" along with its evidentiary offerings, and ultimately the on the record stipulation.
>
> > [Plaintiff's Counsel]:... Ladies and gentlemen of the jury, it has been stipulated between the parties that the Defendants, the Individual Defendants in this case Kristin Leitner, M.D., Whitney Bender, M.D., Sarah Gutman, M.D., Julie Suyama, M.D., and Victoria Kroesche, the nurse, were agents and servants of the hospital, acting within the scope of their employment, when they delivered care to [D.H.] and [J.H.].
> >
> > The Court: So stipulated, Counsel?
> >
> > [Defense Counsel]: Yes, your Honor.
>
> Plaintiff[] never abandoned, at trial, the[] claims of negligence against the team (individual) healthcare providers as evidenced by the stipulation, the jury instructions, and the wording of the verdict slip, which through agency listed Leitner, Bender, Gutman, Suyama and Kroesche.
>
> The team concept was introduced to the jury during opening statements, fully articulated by both sides in describing what occurred in the delivery of J.H. According to defense counsel . . . "Now, it is my privilege to represent the Hospital of the University of Pennsylvania and these medical providers . . . . You will see Penn delivers high-quality medical care. And these physicians and the nurse . . . did this care . . . . They were working as a team to take care of [D.H.] . . ." N.T.[ Apr. 3, 2023 a.m., [at] 70. [Defense counsel] introduced each of his clients to the jury

as part of HUP's medical team, describing their background and status/role in the team. *Id.* [at] 71-73. Dr. Leitner was introduced as " . . . the attending physician. . . . [S]he was in charge of the team and she accepts that responsibility. And she was directly involved in [D.H.'s] care and was making the decisions here, as she should." *Id.* [at] 71-72. Residency at HUP, "a teaching hospital" was explained, with Doctor Bender introduced as "the chief resident," Doctor Gutman (a second-year resident), and Doctor Suyama (a first-year resident) as "a team of residents" that "work as a team under the supervision of the attending physician." *Id.* [at] 72-73.

It was against this backdrop that set the stage for the presentation of evidence to the jury. Thereafter, Plaintiff effectively and convincingly met its burden by presenting more than sufficient evidence of each individual team member[']s role, and breach of care in the obstetric services rendered and resultant harm to J.H.

Plaintiff's timeline of events on the morning of and leading up to the afternoon [c]esarean delivery was established primarily through the testimony of Dr. Michael Cardwell, their expert in [m]aternal[-f]etal [m]edicine and OB/GYN. Dr. Cardwell, who reviewed the HUP records, identified, and opined when deviations from standard of care decisions were made by the individual providers and as a team. Their deviations from the standard of obstetric care were shown to directly impact and cause the harm to J[.]H.

As summarized by Plaintiff in its Post Trial Memorandum:

" . . . Dr. Cardwell's expert opinions, he testified that the following deviations from the standard of care included: (1) delay in C-section delivery by 1:30; (2) rebutted the defense theory of brain injury due to "a ravaging infection"; (3) failure of an attending physician to see [D.H.] for more than 2 hours given the clinical scenario; (4) failure to recognize fetal distress at 1:00 pm due to a prolonged deceleration and to call for C-section; (5) failing to recognize there was no benefit to continue with labor; (6) failure to timely administer antibiotics; [(7)] administering Pitocin when it was contraindicated and worsened the fetal distress; that [(8)] HUP's providers were

functioning as a team, and that each of them was individually and collectively negligent . . ." Dr. Cardwell's testimony took up most of the day on April 4, 2023, was fully vetted and detailed as to his opinions and the basis for them. [N.T., Apr. 4, 2023 a.m. at] 67-79; and, N.T.[, Apr. 4, 2023 p.m., at] 7-123.

Further evidence of the negligence in delaying delivery and resultant harm to J[.]H[.] was proven through the expert testimony of Dr. Erin Zinkhan (neonatology), Dr. Armando Correa (Pediatric Infectious Disease), and Dr. Mary K. Edwards-Brown (Pediatric Neuroradiology). All of the doctors' opinions were to a reasonable degree of medical certainty. Dr. Zinkhan opined that lack of oxygen in the 30 to 45 minutes prior to the C-section resulted in HIE (hypoxic ischemic encephalopathy); and, that the delayed C-section increased the baby's risk of harm for the neurological injuries that occurred. Dr. Cardwell's testimony confirmed the HIE diagnosis taking into account the CHOP records and discounted the FIRS diagnosis (Fetal Inflammatory Response Syndrome) which the defense sought to promote; and opined that HIE "occurred very close to the time of birth." N.T.[, Apr. 6, 2023 a.m., at] 53-68. Finally, Dr. Edwards-Brown['s] opinion as to when the injury occurred " . . . I see here is an acute process. It happened. It happened right at the end . . ." "I'm talking about the last half hour or so of intrauterine life." N.T.[, Apr. 6, 2023 p.m., at] 21-24.

As to baby J.H.'s "alleged injuries": said injuries were actual, seriously impactful and life altering. Dr. Zinkhan gave extensive testimony about the stresses to J.H. which occurred during D.H.'s labor and delayed delivery. The doctor described J.H.'s injuries as "severe brain injury . . . and he suffers from long term problems that are consistent with a severe hypoxic ischemic encephalopathy injury at birth" and "he has cerebral palsy, global development, all the things that are concomitant and known to be caused by decreased oxygen and decreased blood flow before delivery." [N.T., Apr. 5, 2023 a.m., at 30]. Zinkhan further opined ". . . these problems happened very soon before birth, within the last 30 to 45 minutes before he was delivered and delivering him before that time, before the injury occurred would have resulted in him being normal." *Id.* at 30-33.

So, in sum: Plaintiff's evidence through its experts sufficiently and competently established (1) standard of care and deviation therefrom of the healthcare providers individually, and as a team. The claims against the individual providers were not abandoned at trial; (2) HUP's vicarious liability was established through the evidence and stipulation, thus its liability for the negligence of its healthcare providers; (3) and J.H.'s severe, irreversible neurologic injuries were a direct result of the delivery delay.

The defense, of course, put into evidence expert testimony contrary to the opinions of Plaintiff's expert on all of the key issues. The jury was properly instructed as to how to evaluate expert testimony, including conflicting expert opinions. Clearly, with its unanimous verdict, any conflicts were resolved in favor of Plaintiff.

As stated in **Tindall v. Friedman**, 970 A.2d 1159 (Pa. Super. 2009): The entry of judgment notwithstanding a jury verdict is a drastic remedy. A court cannot lightly ignore the findings of a duly selected jury. Citing, **Neal by Neal v. Lu**, 365 Pa.Super. 464, 530 A.2d 103, 110 (Pa.Super. 1987).

This Court is not compelled to take such a drastic step after consideration of the law and evidence in this matter.

Trial Ct. Op. at 9-13 (some internal citations omitted).

We agree with the trial court. Plaintiff was required to establish that HUP's agents acted negligently. She did that through the expert testimony and other evidence presented. The jury did not need to make an express finding as to each individual defendant, particularly where HUP focused its argument and testimony on how the employees worked as a team. Furthermore, as set forth by the trial court and explained above, Plaintiff

admitted testimony as to the standard of care for individual employees and how the breaches of the standards caused harm to J.H.[5]

_____

[5] Under Pennsylvania Rule of Civil Procedure 227.1, a court may grant post-trial relief only if the litigant previously raised the grounds:

> Except as otherwise provided by Pa.R.E. 103(a), post-trial relief may not be granted unless the grounds therefor,
>
> (1) if then available, were raised in pre-trial proceedings or by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof or other appropriate method at trial; and
>
> (2) are specified in the motion. The motion shall state how the grounds were asserted in pre-trial proceedings or at trial. Grounds not specified are deemed waived unless leave is granted upon cause shown to specify additional grounds.

Pa.R.Civ.P. 227.1 (b)(1)-(2). This requirement applies to requests for JNOV: "A ground for a new trial or a judgment notwithstanding the verdict may not be raised for the first time in the Motion for Post-Trial Relief." Pa.R.Civ.P. 227.1(b)(1) cmt. Accordingly, a litigant waives a claim for JNOV if he or she did not raise it before the trial court by an appropriate method. ***See Phelps v. Caperoon***, 190 A.3d 1230, 1247 (Pa.Super. 2018).

Here, HUP requested a nonsuit on the corporate negligence claim, which was unopposed, and a nonsuit on a negligence claim with regard to high blood pressure and preeclampsia and on a claim regarding a failure to document fetal heart rates, arguing there was not testimony as to standard of care regarding the documentation. N.T., Apr. 11, 2023 a.m., at 19-21. HUP did not challenge the lack of an objective standard of care for anything other than documenting the fetal heart rate, did not challenge causation until its post-trial motion, and did not ever challenge the methodology used by any expert. Accordingly, it has waived any challenge to the standard of care testimony or causation, or claims that the expert testimony was not based on facts or science.

Regardless, as explained above, Plaintiff presented sufficient evidence on all elements of a medical malpractice claim, including breach of duty of standard or care and causation.

To supports its claim that a verdict as to the Individual Defendants was required, HUP relies on cases where a jury found the agent not negligent or on cases that state a general proposition that an employer cannot be vicariously liable unless there is a cause of action against an employee. ***See, e.g., Keffer v. Bob Nolan's Auto Serv., Inc.***, 59 A.3d 621, 638 (Pa.Super. 2012) (citation omitted) (employer not liable where agent found not negligent); ***Skalos v. Higgins***, 449 A.2d 601, 603-04 (Pa.Super. 1982) ("Where the master is joined with his servant in an action based wholly on the servant's negligence or misconduct, the master cannot be held liable unless there is a cause of action against the servant"). Here, Plaintiff was required to establish the liability of HUP's employees to establish HUP was vicariously liable, and she did so. HUP's liability was based on the actions of its employees.[6]

III.    Request for New Trial

HUP maintains the court erred in denying its motion for a new trial. We will reverse an order denying a motion for a new trial only where there is "a clear abuse of discretion or an error of law [that] controls the outcome of the

_____

[6] Further, in ***Corey v. Wilkes-Barre Hosp. Co. LLC***, 307 A.3d 701, 706 (Pa.Super. 2023) (*en banc*), cited by HUP, this Court quoted from a verdict slip that listed individual employees. We did not find that such a listing was required. In addition, in ***Sutherland v. Monongahela Valley Hosp.***, 856 A.2d 55, 62 (Pa.Super. 2004), this Court found it need not discuss the applicability of vicarious liability because the evidence failed to establish the unidentified employee was negligent when he or she failed to relay complaints; we did not address whether vicarious liability can apply without a verdict as to each individual defendant.

case." ***Maya v. Johnson & Johnson & McNeil-PPC, Inc. (In re McNeill-PPC, Inc.)***, 97 A.3d 1203, 1224 (Pa.Super. 2014) (quoting ***Seigel v. Stefanyszyn***, 781A.2d 1274, 1275 (Pa.Super. 1998)). We must first determine whether an error occurred and, if it did, we next ascertain "whether the error resulted in prejudice necessitating a new trial." ***Czimmer v. Janssen Pharms., Inc.***, 122 A.3d 1043, 1051 (Pa.Super. 2015) (citation omitted). To determine whether prejudice occurred, the "[c]onsideration of all new trial claims is grounded firmly in the harmless error doctrine[.]" ***Knowles v. Levan***, 15 A.3d 504, 507 (Pa.Super. 2011) (citation omitted). The error in question must have affected the verdict. ***Id.*** at 508 n.4.

    A. <u>Vicarious Liability Question on the Verdict Slip</u>

HUP first argues the jury was not asked to determine whether any agent or employee was liable for the injuries and therefore failed to establish a basis for vicarious liability. It claims it "had an unfettered right to have the individual health care providers' names included on the verdict slip, to have their liability individually decided and apportioned, and to preserve its right to indemnification." HUP's Br. at 36. It argues that a determination of percentage of liability would allow it to challenge the percentages and argues the individual defendants had a right to have the claims adjudicated against them.

The trial court concluded:

> The jury received evidence regarding the actions of each of the individual healthcare providers during the course of the obstetrics care herein. Plaintiff met its burden of presenting clear, credible, detailed expert testimony on standards of care and deviations therefrom. Most

importantly, in this issue as stated, the jury was fully and accurately instructed by the [c]ourt on negligence, factual cause and specifically professional negligence standard of care.

During the jury charge, professional standards of care were articulated as to physician, nurse, and resident. The jury was instructed to evaluate the action or inaction of the healthcare providers in assessing negligence and factual cause. The defense had no objection to the standard of care charges, and in fact, the [c]ourt gave the charge as to residents as requested by the defense. Agency was also made clear to the jury, in pertinent part "a person may be both the agent of a physician and an agent of a hospital." There is no ambiguity, the jury was not confused with the verdict slip. The instructions were clear, the jury evaluated the evidence consistent with the instructions, considered the evidence and standard of care regarding the healthcare professionals. There can be no question that this unanimous verdict reflects the jury decision that at least one of the [Individual] Defendants, if not all, violated their applicable standard of care and was a factual cause of harm to J.H. As such, through vicarious liability HUP is liable.

Trial Ct. Op. at 18-19 (internal citations omitted).

The court did not abuse its discretion. The verdict slip had the individual providers' names on it, and, through its verdict, the jury found that at least one of the Individual Defendants was negligent and that the negligence caused harm.[7] The jury reached its verdict after hearing evidence that the Individual Defendants had deviated from standards of care and harmed J.H., and after being properly instructed on the elements of medical malpractice and vicarious

---

[7] We further note that a jury need not apportion liability in vicarious liability claims. **See Kimble v. Laser Spine Inst., LLC**, 264 A.3d 782, 794 (Pa.Super. 2021) (*en banc*).

liability. We perceive no error, and even if there was one, it was at most harmless.

B. <u>Causation Question on the Verdict Slip</u>

HUP further maintains the court erred by providing a causation question on the verdict slip that misstated Pennsylvania law because it allowed the jury to find causation if the negligence was a factual cause "and/or" increased the risk of harm. It argues the question should have asked only whether the negligence of the Individual Defendants was the factual cause of harm, without the phrase "and/or increase the risk of harm." It argues increased risk of harm is an evidentiary standard that assists the plaintiff in establishing a *prima facie* case of medical malpractice, and once a plaintiff establishes an increased risk of harm, the jury must then determine whether the increased risk was a substantial factor in bringing about the harm. It maintains a proper charge on causation does not cure the verdict slip error.

This Court applies the standard of review of jury instructions to a challenge to a verdict slip. **Seels v. Tenet Health Sys. Hahnemann, LLC**, 167 A.3d 190, 208 n.5 (Pa.Super. 2017). We review a challenge to jury instructions to "determine[e] whether the trial court committed a clear abuse of discretion or error of law controlling the outcome of the case." **Passarello v. Grumbine**, 87 A.3d 285, 296 (Pa. 2014) (citation omitted). "Error in a charge is sufficient ground for a new trial if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue." **Id.** (citation omitted).

The trial court found no error. Trial Ct. Op. at 15. The court concluded that HUP "failed to identify how it was prejudiced" by this aspect of the verdict slip because "the jury instructions on causation were unobjected to, clear, detailed and legally accurate." *Id.* at 17.

The trial court did not abuse its discretion. We conclude that, even if the trial court erred when it included increased risk of harm on the verdict slip, the error was harmless. The trial court properly instructed the jury, including an instruction that a finding of increased risk of harm can be a sufficient basis from which the jury could find the negligence was a factual cause of the injury. N.T., Apr. 20, 2023 p.m., at 25-27. The instructions clearly set forth the law for the jury. The verdict slip, as a whole and in context, was sufficiently clear and did not confuse the jury, and was at most harmless error.

C. Cord Blood Gas Results Testimony

HUP next maintains the trial court improperly precluded testimony from Dr. Leitner about J.H.'s cord blood gas results. It claims her testimony would have established the blood samples were properly drawn and that J.H. did not experience a low-oxygen event prior to birth. It claims that the cord blood gas results were "one of the most definitive ways to establish whether the condition from which J.H. suffered was caused by a hypoxic (loss of oxygen) event at or near his birth . . . or a result of his underlying chorioamnionitis." HUP's Br. at 41. It claims Dr. Leitner had first-hand knowledge of the taking of the sample and should have been permitted to testify about what she observed and the effect the results had on her decision making. It argues the

testimony also was relevant to rebut the plaintiff's expert's speculation that the results were in the normal range due to the improper collection of the cord blood sample.

"Evidentiary rulings are committed to the sound discretion of the trial court, and will not be overruled absent an abuse of discretion or error of law." *Oxford Presbyterian Church v. Wel-McLain Co., Inc.*, 815 A.2d 1094, 1099-1100 (Pa.Super. 2003) (citation omitted). "[T]o find that the trial court's evidentiary rulings constituted reversible error, such rulings must not only have been erroneous but must also have been harmful to the complaining party." *Id.* at 1100 (citation omitted).

Here, the parties had conflicting interpretations of the cord blood gas results, which were based on a sample taken from a specimen of the umbilical cord post-delivery. A defense expert testified that the cord blood gas results showed there was "no low oxygen at the time of the baby's birth" and disputed Plaintiff's position that J.H. lacked sufficient oxygen at the time of birth. N.T., Apr. 17, 2023 a.m., at 38. The expert further opined that Plaintiff's expert testimony that the sample was improperly collected was "pure speculation," and the record did not warrant such a finding. *Id.* at 71. The defense also attempted to introduce testimony regarding the cord blood gas from Dr. Leitner. Plaintiff objected, and the trial court sustained the objection. N.T., Apr. 11, 2023 p.m., at 52.

The trial court concluded:

> The objections to Defendant Leit[ner] testifying about the [cord blood gas] results were made on relevancy grounds, that it was formulated in anticipation of litigation to justify the defense "we never do anything wrong approach," and that it would be cumulative to the defense expert testimony on the issue. The objection was properly sustained. The post-birth testing played no part in Leitner's, or anyone else on the HUP team, decision making surrounding the delivery of J.H. Finally, there was no prejudice to the defense as they were able to fully make their position on the [cord blood gas] through their expert, Dr. Goetzl.

Trial Ct. Op. at 20 (citations omitted).

This was not an abuse of discretion. The cord blood sample was extracted after birth, and it would not have impacted Dr. Leitner's decisions regarding D.H.'s care before birth. Furthermore, Dr. Leitner's testimony would have been cumulative of the defense expert testimony, and therefore, HUP has not established it was prejudiced by the preclusion of her testimony.

## IV.   Weight of the evidence

HUP maintains the liability verdict, the award for future medical expenses, and the pain and suffering award, were against the weight of the evidence.

We review the trial court's ruling on a weight claim for abuse of discretion. We do not rule on "the underlying question of whether the verdict is against the weight of the evidence." *Helpin v. Trs. of Univ. of Pa.*, 969 A.2d 601, 615 (Pa.Super. 2009), *aff'd*, 10 A.3d 267 (Pa. 2010) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000)).

> A trial judge [considering a weight challenge] must do more than reassess the credibility of the witnesses and allege that

he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

**Helpin**, 969 A.2d at 615-16 (citation omitted).

HUP again asserts that this Court must grant a new trial on weight of the evidence grounds because, in its view, the evidence does not support a finding that HUP is vicariously liable. It maintains there is no finding that any Individual Defendant breached a standard of care or caused harm to J.H. It relies primarily on its experts' testimony that the Individual Defendants met the standards of care.

The trial court concluded:

The Court has addressed this issue at great length in reviewing [HUP]'s various complaints. In sum, the Plaintiff presented more than enough credible evidence establishing the liability of "one or more" of HUP's agents, the Individual Defendants and as the healthcare provider team, and through agency, as stipulated, the vicarious liability of HUP. The jury was properly instructed, without objection, to all relevant matters unique to this case, including professional negligence standard of care as to each of the individual healthcare providers [and] factual cause[.]

Trial Ct. Op. at 24.

This was not an abuse of discretion. Insofar as HUP attacks the sufficiency of the evidence, as above, the evidence supported the verdict finding HUP vicariously liable for negligence. The remainder of HUP's argument improperly asks this Court to reassess credibility and weight. That is not a

proper basis for finding a verdict against the weight of the evidence, let alone for finding an abuse of discretion in rejecting a weight challenge.

HUP next maintains the verdict was against the weight of the evidence with regard to the award of future medical expenses in the amount of $101,037,791.00. It argues that the award was based on a projected life expectancy for J.H. of 70 years even though no expert opined that he would live to the age of 70. It notes the Plaintiff's expert stated she was not providing an opinion on life expectancy and HUP's expert had a life expectancy of, at most, 29 years of age.

The trial court concluded the future medical expenses award did not shock the conscience:

> [HUP's] claim that the "Jury's award of Future Medical Expenses and Non-Economic Loss Damage was based on Speculation and Shocks the Conscience" is without basis. The award was not based on speculation as sufficient evidence was presented to the jury, and they were properly instructed as to how to analyze that evidence. Significantly, based on the trial record, there is no shocking of the conscience with the award.
>
> Plaintiff's Life Care Planner, Jody Masterson[,] testified in detail about what care, services, and equipment J.H. would need for the rest of his life along with the cost. Masterson did not opine on J.H.'s life expectancy but used the U.S. Life Table for the purpose of her report. Plaintiff's plan included four different scenarios for the jury to consider; for example: services rendered in-home versus residential, different levels of service; and varying age ranges. Using the U.S. Life Tables, Masterson took the plan out to age 75 with total cost for the different scenarios: ages 5 to 21 at home $5,889,981; ages 5 to 21 residential faculty $7,054,793; residential facility ages 5 to 75 $20,644,559; and at-home age 5 to 75 $32,773,197.

Doctor Michael Katz, Plaintiff's pediatric expert testified about the multitude of ailments associated with J.H.'s brain injury, and what the future holds relative thereto. As to future needs, Doctor Katz identified the following:

There's two major issues. One is he's dependent on his caretakers for all the activities of daily living. They need to feed him, keep him clean, they need to keep his skin clean and dry. He is diaper dependent. He doesn't go to the bathroom. He doesn't ask for things. Someone who knows him needs to keep him on a schedule and take care of him. He's not going to say, I don't feel well, because he can't use words. So, someone will have to be able to take him appropriately to the doctor with any change in his state. And they will have to know that this is not normal for him.

The second issues are issues related to growth. So, when kids who have increased motor tone grow, they tend to have orthopedic issues . . . So, issues related to growth, things like neurogenic or scoliosis, a curvature of the spine related to the fact that the pelvis is tilted a little. When the pelvis is tilted a little, when there's asymmetry in the legs, they don't grow the same when it's very tight. There is hip-related issues, joint related issues.

[N.T., Apr. 10, 2023, at 95-96].

Doctor Katz went on to discuss the medications and therapies J.H. would require in addressing his permanent condition throughout his life. The doctor also evaluated Masterson's life care plan for J.H, and found it to be necessary and appropriate. While Doctor Katz referred Masterson to the U.S. Life Tables, he was not aware that the Tables extended life expectancy to age 75 for all males in J.H.'s category (without accommodating for issues such as J.H. experienced). On cross-examination, Katz agreed that being non-ambulatory decreased life expectancy by 5 to 10 years.

In contrast, Doctor Mark Mintz (Pediatric Neurology) provided defense expert testimony by way of deposition about J.H.'s life expectancy. Doctor Mintz's maximum projection for J.H.'s life expectancy was to age 29. Nurse

Laura Fox provided defense expert testimony on life care planning for J.H. Fox prepared a chart containing what J.H.'s needs would be, greatly divergent from the care levels and cost projections of Plaintiff. The defense life care plan was hundreds of thousands of dollars less than Plaintiff's plan and did not include the option of stay home care.[5]

[5] Astoundingly, Nurse Fox did not even take into account what D.H.'s concern might have been for J.H.'s care. When asked why in-home wasn't considered as an option, the response was "I don't do that in my life care plan. I always have a vision of the child of where I want them to be and then I pursue that option." [N.T., Apr. 18, 2023 a.m., at 54].

Post-trial, a major area of contention is directed to the introduction of the U.S. Life Tables. The U.S. Life Table was referenced without objection and was a proposed jury instruction submitted by both sides. Any defense complaint at this juncture has been waived.

Trial Ct. Op. at 24-26 (some internal citations omitted).

Masterson did not opine on J.H.'s life expectancy but used the U.S. Life Table for the purpose of her report. N.T., 4/3/23 p.m., at 37-38. Plaintiff's plan included four different scenarios for the jury to consider; for example: services rendered in-home versus residential, different levels of service, and varying age ranges. *Id.* at 41-66. Using the U.S. Life Tables, Masterson took the plan out to age 75 with total cost for the different scenarios: ages 5 to 21 at home $ 5,889,981; ages 5 to 21 residential faculty $7,054,793; residential facility ages 5 to 75 $20,644,559; and at-home age 5 to 75 $32,773,197. *Id.* at 68-70. Further, Borzilleri testified that under the life expectancy tables, a normal life expectancy for a male would be 75 years of age, and Dr. Katz testified that someone who is unable to walk would have a decreased life expectancy, by five to 10 years. N.T., Apr. 10, 2023, a.m., at 58, 114-15.

The trial court did not abuse its discretion in finding the verdict on future medical expenses was not against the weight of the evidence. The jury was presented evidence on the cost of the care J.H. requires, and presented with life expectancy tables and J.H.'s life expectancy, and based its award on the evidence presented, concluding J.H. had a life expectancy of 70 years of age. The award does not shock the conscience.[8]

HUP next maintains the weight of the evidence did not support the pain and suffering award of $80 million. It maintains that its expert testified that "due to J.H.'s limited brain function, J.H. 'has a limited ability to interpret' pain" and that Plaintiff presented no evidence to counter this testimony. HUP's Br. at 49. HUP maintains the Plaintiff did not present evidence to establish the degree to which J.H. can experience physical or emotional pain. It maintains that D.H. is not competent to testify about the "complex medical issues," and that her testimony, such as the testimony J.H. makes noises when hungry, "is not empirical or medical evidence that in any way substantiates his actual brain function or cognitive abilities, or establishes that he appreciates his current state." *Id.* at 49-50. It further maintains the jury should not have awarded anything based on D.H.'s, rather than J.H.'s, loss.

---

[8] We further point out that the future expenses "shall be paid in the years that the trier of fact finds they will accrue," and "[l]iability to a claimant for periodic payments not yet due for medical expenses terminates upon the claimant's death." 40 P.S. § 1303.509(b)(3), (5).

The trial court concluded the pain and suffering award was not against the weight of the evidence:

> Once again, the defense presents an incomplete representation of the evidence; here, regarding the testimony of Dr. Katz. The defense selectively picks out a small section of Katz's opinion on J.H.'s pain and suffering, which took place as follows: . . .
>
> Q: Let's talk about those for a second, the hip and joint issues. Does Jay fe[e]l pain from this?
>
> A. Oh yeah. Kids can be quite uncomfortable from this.
>
> [N.T., Apr. 10, 2023, at 96].
>
> HUP characterizes this as a "completely generalized statement," but fails to include the context in which the testimony was elicited. Moreover, there was no mention of the extensive explanation proffered by Katz as to J.H.'s physical injuries, presently and what to expect in the future. Significantly, the very next question to Dr. Katz after he testified that J.H. felt pain, was for him to "Explain why this is so, why this causes so much pain." This led to a detailed explanation about the spasticity associated with J.H.'s injuries and pain it caused.[] *Id.* [at] 96. One of the ramifications of that pain is irritability. Interestingly, irritability is one of the ways J.H. communicated to his mother, D.H., that he is uncomfortable.
>
> The jury was able to observe and judge for themselves the physical infirmities and condition of J.H., now age 5, when he was brought into the courtroom on April 10, 2023. J.H.'s G-tube was shown to the jury as D.H. described how, at present there was no irritation. The wheelchair stroller used to bring J.H. into the courtroom, was described along with the other medical apparatuses needed and used to care for J.H.
>
> While in the courtroom, J.[H]. was on the floor with his mother when she demonstrated one of the home therapies for J.H. called "tummy time" where J.H. is supported by pillows and techniques are used to stretch his "tight" legs

and hands which "stay fisted closed." ***Id.*** [at 40-43]. D.H. described that one of the procedures she was demonstrating was being tolerated by J.H. because "if he doesn't tolerate something, he'll start shaking or getting irritated." ***Id.*** [at] 40-41. Through D.H. the jury was able to learn how J.H. communicated his emotions: he laughs, he smiles, his little noises; he recognizes family members; he displays anger; when hungry "he keeps sticking his tongue out"; when upset "he starts shaking, and starts crying"; and, when happy "… do the biggest smile from cheek to cheek. He makes this loud cooing noise." ***Id.*** [at] 37, 43-44.

The jury had ample, competent evidence from which to evaluate pain and suffering/loss of life's pleasures and resolve any conflicts in arriving at its award.

Trial Ct. Op. at 27-28 (some internal citations omitted).

The trial court did not abuse its discretion. Plaintiff admitted evidence of J.H.'s pain and suffering, which the jury credited. The trial court acted within the range of its discretion in finding that the award does not shock the conscience.

V.   Remittitur

We reverse a denial of a motion for remittitur only if the trial court abused its discretion:

Our standard of review from the denial of a remittitur is circumspect and judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption. Furthermore, [t]he decision to grant or deny remittitur is within the sole discretion of the trial court, and proper appellate review dictates this Court reverse such an Order only if the trial court abused its discretion or committed an error of law in evaluating a party's request for remittitur.

***Tillery v. Children's Hosp. of Phila.***, 156 A.3d 1233, 1246 (Pa.Super. 2017) (quoting ***Renna v. Schadt***, 64 A.3d 658, 671 (Pa.Super. 2013)).

HUP maintains the court failed to employ the correct measure to test the excessiveness of the award. HUP argues that it applied a sufficiency of the evidence analysis, but should have ensured that the loss sustained was compensated with the least burden to the wrongdoer consistent with fair compensation. It maintains that the court failed to consider whether the verdict was based on improper considerations. It challenges the Plaintiff's closing argument, including a reference to Jalen Hurts' $51 million contract and suggestion the jury should consider non-party disabled children when awarding damages. It also argues the jury likely awarded damages out of sympathy for D.H., which was improper as she had no claim for damages. It points in support to Plaintiff counsel's closing argument where he stated HUP "destroy[ed]" D.H.'s life. HUP's Br. at 55.

HUP did not object to Plaintiff's closing argument and therefore has waived any argument based on statements made therein. ***See Dilliplaine v. Lehigh Valley Tr. Co.***, 322 A.2d 114, 116 (Pa. 1974) (Pennsylvania law requires "timely specific objection" that "ensure[s] that the trial judge has a chance to correct alleged trial errors").

Further, the trial court did not apply the wrong standard to the request for remittitur. Rather, it applied the standard set forth above. As discussed, remittitur is proper only if "the award of damages falls within the uncertain limits of fair and reasonable compensation or [if] the verdict so shocks the

- 40 -

sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." **Tillery**, 156 A.3d at 1246 (citation omitted).

Here, the trial court concluded that, based on the facts of this case, the award did not shock one's sense of justice:

> Considering the unique and special circumstances of this case, the verdict although large, is not excessive and does not shock one's sense of justice.
>
> At the outset, there can be no credible argument against the severity of J.H.'s birth related injuries[.] . . . In fact, at birth J.H. suffered a severe brain injury which is catastrophic and permanent. When J.H. entered this world, he was not breathing and required "significant resuscitation." [N.T., Apr. 5, 2023, at 64]. "He got nearly five minutes of the team having to breathe for him in order to get him into a better state." **Id.** [at] 63. Thereafter, J.H. was placed on a CPAP machine to keep his lungs open. As J.H.'s "profound HIE" progresses within a matter of days post birth, J.H. is noted as having seizures . . . "constant seizures. The brain is constantly in a state of such abnormal activity that it's just going haywire." [N.T., Apr. 5, 2023, p.m., at 23]. At CHOP, MRI results showed "profound HIE" and D.H. was informed about the "extreme hypoxic insult and that large areas of brain had been deprived of oxygen for an undetermined period of time." **Id.** [at] 22-24. Injuries so severe, taking J.H. off life support was discussed with D.H. This is how the severe and permanent brain injury manifested itself within the first few days of J.H.'s life.
>
> Through J.H.'s in-person appearance during trial, the Court and jury was provided firsthand, objective physical evidence of his disfigurement; and, at five years old, stunted growth; his clenched atrophied fists; floppiness; the G-tube needed for feeding; and his nonverbal interaction with his mother. During the visit the trial participants were introduced to some of the medical equipment needed to assist in J.H.'s daily activities: hand splints, feet and leg

braces; wheelchair stroller for outings such as to the courtroom; and, for home, seating and bath chairs.

While observing J.H. in the Courtroom, D.H. described the child's ability to "feel" and display emotion. According to D.H., J.H. was capable of recognizing and smiling at family members; was hesitant around strangers; displayed happiness, sadness and anger; communicating when hungry; reacting to discomfort by shaking and displaying irritation.

Dr. Katz, Plaintiff's expert in pediatric neurology discussed how J.H.'s injury manifested itself physically and caused pain; for example, extremities don't grow and become tight causing pain. Katz's testimony has already been discussed in great detail. However, in this claim the Court points to Katz's unequivocal testimony that J.H. feels pain. Again, in context Katz was asked: " . . . the hip and joint issues. Does Jay feel pain from this?["] The response, "oh yeah. Kids can be quite uncomfortable from this" following with an explanation, including how children respond with irritability. *Id.* [at] 97. D.H. described J.H.'s irritable reaction to discomfort.

In all of the reasons set forth above and in other sections of this Opinion relating to the diagnosis, severity, permanency of injuries along with future medicals and needs, the noneconomic damages are not excessive. J.H.'s quality of life is and will continue throughout his life to be severely limited. He will never be independent and will need the care of others for basics of life such as bathing, toileting, eating, etc. He will never work. He will experience pain. He will need therapies and surgeries. He will not walk and talk. All because of a 30 to 45 minutes unwarranted delay in his birth.

The Court is not persuaded by the defense arguments related to life expectancy and the U.S. Life Table projections. The defense made no objection at trial, and, in fact submitted proposed jury instruction on the tables. At defense request "race" was excluded from the jury instruction about the life tables. At the sidebar prior to sending the jury to deliberations, the sole clarification to the charge, was at defense request to correct the Court's inadvertent omission to include "you may also consider

expert testimony regarding reduction in life expectancy."
4/20/23 p.m. [at] 38. The Court immediately made the
correction and re-recited the life expectancy charge in full.
Significantly, the jury was properly charged and instructed
that the statistics were "only a guideline" to which they were
not bound. The jury was instructed further that:

> In reaching this decision, you must determine how
> long he will live considering his health, present and
> future situation and all other factors you find will affect
> the duration of his life.

*Id.* [at] 37.

Trial Ct. Op. at 29-31 (some internal citations omitted).

This was not an abuse of discretion. Although large, it was based on the facts of the case, and the evidence supports it. The trial court properly concluded that the award does not shock the conscience.

HUP next maintains the court erred in not holding a hearing to consider the effect of the verdict on access to health care in the community. It argues the MCARE statute provides the court "shall" consider evidence of impact on the availability of access to healthcare in the community when a verdict is challenged on excessiveness grounds. It claims a hearing would only have discussed the impact on access to healthcare and would have provided the opportunity to present the evidence the court claimed it lacked.

Under MCARE, a trial court must "consider evidence of the impact" of the verdict upon the availability or access to healthcare in the community:

> **(a) General rule.--**In any case in which a defendant health
> care provider challenges a verdict on grounds of
> excessiveness, the trial court shall, in deciding a motion for
> remittitur, consider evidence of the impact, if any, upon
> availability or access to health care in the community if the

defendant health care provider is required to satisfy the verdict rendered by the jury.

**(b) Factors and evidence.--**A trial court denying a motion for remittitur shall specifically set forth the factors and evidence it considered with respect to the impact of the verdict upon availability or access to health care in the community.

**(c) Abuse of discretion.--**An appellate court reviewing a lower court's denial of remittitur may find an abuse of discretion if evidence of the impact of paying the verdict upon availability and access to health care in the community has not been adequately considered by the lower court.

40 P.S. § 1303.515(a)-(c).

The trial court concluded that MCARE did not require an evidentiary hearing. It pointed out that HUP requested the production of expert reports and an evidentiary hearing where testimony from the experts and declarants could be heard. The court concluded that the post-trial motions and the lengthy oral argument gave it sufficient information on which to base its decision on remittitur. It reasoned "[a] protracted discovery process, and trial within a trial would unduly impact judicial resources and place an undue burden of time and expense on Plaintiff." Trial Ct. Op. at 33-34.

We find no error. MCARE requires that trial courts consider evidence on impact in the community, but does not mandate an evidentiary hearing. Here, HUP presented declarations in support of its position, which the trial court considered when denying the motion.

HUP makes a final claim that this Court has an independent role in reviewing excessiveness of awards and that we should grant remittitur here because "an objective view of the award establishes it is out of line with

awards in other cases involving serious injuries." HUP's Br. at 57. It maintains that the size of the award shocks the conscience.

The cases relied on by HUP require a finding the trial court abused it discretion in denying remittitur or did not abuse its discretion in granting remittitur, before any relief can be granted by this Court. *See, e.g., Smalls v. Pittsburgh-Corning Corp.* 843 A.2d 410, 417-18 (Pa.Super. 2004) (finding the trial court abused its discretion in failing to order remittitur or grant a new trial on excessive damage award and finding a remand for a new trial was required where any award based on the record would be arbitrary); *Haines v. Raven Arms*, 640 A.2d 367, 370 (Pa. 1994) (finding trial court did not abuse its discretion in granting remittitur). As outlined above, we conclude the trial court did not abuse its discretion in finding that the award does not shock the conscience. No relief is due.

Judgment affirmed.

Judge Lane joins the opinion.

Judge Stabile concurs in the result.


Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 7/10/2025